## Case No. 15,432.

UNITED STATES v. HUTCHINSON.

[7 Pa. Law J. 365; 4 Pa. Law J. Rep. 211.]

District Court, E. D. Pennsylvania. April 24, 1848.

FEDERAL COURTS—CRIMINAL JURISDICTION—EMBEZZLING PUBLIC MONEYS.

1. The United States courts derive their only power to try, convict or punish in criminal cases from the constitution and the laws made in pursuance of it.

2. The jurisdiction of offences which are cognizable at common law resides in the state courts alone, even though the general government may be the party immediately aggrieved by the misdeed complained of.

3. The acts of congress of 13th August, 1841 [5 Stat. 439], and 6th August, 1846 [9 Stat. 59], under which the prisoner was indicted have obvious reference to persons entrusted by some act of congress with the legal possession of public moneys,—not to those subordinates, who, not having been entrusted with such possession, could be punished for a fraudulent conversion, as felons, without any congressional legislation. The act of 1846 throughout applies not to clerks, workmen, or other servants.

4. A person appointed under the act of 18th January, 1837 [5 Stat. 136], to be clerk for the treasurer of the mint cannot be indicted under the acts of congress of 13th Aug. 1841 and 6th Aug., 1846, for embezzlement of the public moneys.

KANE, District Judge. By the act of congress of 18th January, 1837, it is enacted that "the officers of the mint of the United States shall be a director, a treasurer, a melter and refiner, a chief coiner, and an engraver;" and these are to be appointed by the president, with the advice and consent of the senate. Of the treasurer so appointed, it is required among other things (section 2) that "he shall receive and safely keep all moneys which shall be for the use and support of the mint; shall keep all the current accounts of the mint, and pay all moneys due by the mint, on warrants from the director." The act then provides for the appointment of assistants to certain of the officers, and of clerks for the director and for the treasurer, in case they shall be needed; these are to be appointed by the director of the mint, with the approbation of the president of the United States, the assistants "to aid their principals," and the clerks to "perform such duties as shall be prescribed for them by the director." Section 3.

The prisoner was appointed under this act in the year 1840, to be a clerk for the treasurer of the mint; and among the duties prescribed for him by the director was the charge of, the ordinary or contingent fund, by which name the moneys for the ordinary uses of the mint were designated. In this capacity he received the moneys of that fund as they were remitted or transferred to the treasurer of the mint by the orders of the treasury department; and paid them out as warrants were drawn upon the treasurer of the mint by the directors, making the proper entries of such receipts and payments in the books of account of the mint. He had the key of a closet in which the moneys of this fund were kept, but the outer key of the vault of which the closet formed part was in the charge of another person. The books of account were, all of them, kept in the name and on behalf of the treasurer; the acknowledgments for all moneys received were made by the treasurer personally, and the charges for such moneys were entered against him; and all vouchers for payments were taken in the treasurer's name, and he received credit for such payment. The name or intervention of the clerk did not appear in any of the books, vouchers or accounts, either in the mint or in the accounting department at Washington, with which it corresponded.

At the end of the year 1847, it was ascertained that a large sum of money was missing from the contingent fund; and the prisoner, having been arrested, was indicted for embezzlement under the acts of congress of 13th August, 1841, and 6th August, 1846. He was tried in the district court, and found guilty.

I had serious doubts while the case was before the jury, whether it fell properly within the provisions of the acts of congress; and, as the question was of the first impression, I was desirous that it should be discussed more fully than it could be at bar. I therefore charged against the prisoner upon the several points of law, announcing my purpose, as the case was one in which the circuit and district court have concurrent jurisdiction, to solicit the advice and aid of Judge GRIER upon the hearing of a rule for new

trial, if the verdict should make such a rule proper. He acceded to my wish, and the whole subject has been reviewed before us by the district attorney and the counsel for the prisoner in the most ample manner. The result is an unhesitating concurrence of opinion between my learned brother and myself that the verdict cannot stand. We regard the history and spirit of these acts of congress, as well as their phraseology, altogether conclusive upon the question.

At the common law, the party who, by the confidence of another, is entrusted with the possession of his property, cannot commit the crime of larceny by appropriating it to his own use. The fiduciary character of the delinquent forms his defence, for the criminal law, until it was modified by statute, took no cognizance of breaches of trust. At the same time it distinguished between the legal possession of property, such as the very existence of a trust implies, and that mere charge or supervision which is devolved on a servant or clerk. The servant having a bare charge, to use the words of the law, became guilty of theft by a fraudulent conversion. Thus, on the one hand, a butler, who had charge of his master's plate, the shepherd who watched over his sheep, and the shop-boy, who attended behind his counter, might be convicted of larceny, if they converted to their own use their master's property. While, on the other hand, the attorney who pillaged his principal, the guardian who defrauded his ward, and the officer who embezzled public moneys which the law had confided to him, were not answerable as for crime. See the cases in Mr. Wharton's Am. Cr. Law, 405, 406.

The United States courts have no common law jurisdiction; that is to say, they derive their only power to try, convict, or punish from the constitution, and the laws made in pursuance of it. The jurisdiction of offences which are cognizable at common law resides in the state courts alone, even though the general government may be the party immediately aggrieved by the misdeed complained of. Until the year 1840 the congress of the United States seem to have been, in general, content with the protection, which the laws of the several states gave to the public property within their limits. The integrity of subordinates, who were not themselves entrusted with public money, though they might, from their position, have a certain charge or custody of it, was guarded of course by the common law and the local statutes, as administered by the state courts. Under these, such a subordinate, whether called by the name of watchman, servant, clerk, or assistant, might be punished criminally for a fraudulent conversion to his own use of the moneys of the general government. But the higher officers, the heads of departments, the treasurers of the United States and of the mint, the collectors of customs, land officers, and others. depositories of important public trusts, though required in some instances to give security for their official fidelity, were punishable only by impeachment before the senate of the United States. Several very large defaults having occurred, however, on the part of important public officers of the revenue, it was thought necessary to protect the treasury by additional safeguards. On the 4th of July, 1840 [5 Stat. 385], an act of congress was passed "to provide for the collection, safe-keeping, transfer and disbursement of the public revenue." This act created and defined the crime of embezzlement and made it applicable to all those officers who were charged by the provisions of the act itself with the "safe-keeping, transfer, or disbursement of public moneys." As to all others, officers as well as servants or clerks, except those connected with the post office (to whom it was specially extended,) it left the law unchanged. The act of 1840 was repealed on the 13th of August of the following year; but the provisions respecting embezzlements were re-enacted in a slightly modified form, so as to include among those who might become subject to its penalties all "officers charged with the safe-keeping, transfer or disbursement of the public moneys, or connected with the post office department." But as to all but officers so charged it left the law as it stood before the year 1840. The act of 1846 followed. This substantially re-constituted the treasury system which had been rescinded in 1841, but made further provision also for the punishment of embezzling. Its terms are somewhat broader, perhaps, than those of the two preceding acts, for they apply to "all officers and other persons charged by this act or any other act with the safe-keeping, transfer and disbursement of public moneys." But its spirit and objects are the same; and the detailed provisions of its several sections have obvious reference to persons entrusted by some act of congress with the legal possession of public moneys,— not to those subordinates, who, not having been entrusted with such possession, could be punished for a fraudulent conversion, as felons, without any congressional legislation. The act throughout applies not to clerks, workmen, or other servants, but to the legally authorized custodians of public moneys, the "fiscal agents" recognized as such at the treasury of the United States, charged there with receipts, and credited with disbursements,—in a word, to officers or agents "entrusted" by law or under law with the possession of public money, and bound to account for it.

The duties which it enjoins—the safeguards and checks which it creates; the direct accountability which it prescribes and enforces; the evidence it appeals to as establishing the fact of delinquency,—even the allowance it makes for certain official expenses,—all together stamp on it this limited character. Thus, it requires of the officer that he shall keep an accurate entry of each sum that he receives, and each payment or transfer that

he makes; obviously with reference to the account he is to render of his receipts and disbursements at the treasury department; it makes him punishable if he transmits to the treasury a false voucher, or a voucher that does not truly represent a payment actually made, a transcript from the treasury books, showing a balance against him is made sufficient evidence of his indebtedness,—"a draft, warrant, or order, drawn by the treasury department upon him," and not paid, is the primary proof of his embezzlement,—and provision is made for the necessary clerk hire and other expenses of a large class at least of the officers included within its terms.

It needs no argument to show that these enactments are without just application to a person who is merely a clerk himself—who is known to the treasury department—who is neither charged nor credited with public moneys there or elsewhere—who transmits no vouchers, because he renders no account—against whom therefore, no treasury transcript can ever be produced,—on whom no treasury draft, warrant, or order can be drawn under any circumstances, and to whom neither the act of 1846 nor any other act has ever entrusted public moneys, either personally or by official designation. The prisoner was such a person. In point of fact, he was never in legal possession of the moneys he has abstracted. They were moneys of the United States, in which he had no special or qualified property, which had been entrusted to the safe-keeping of the treasurer of the mint by the express language of an act of congress, and which could not be withdrawn from his legal custody and charge except by warrant of an appropriate officer in the form designated by law. We do not understand that the prescription of the clerk's duties by the director was intended or supposed to interfere with this official charge of the treasurer. Had it been so, there would have been some record, some book entry, some memorandum at least in the mint, showing the character, if not the amount, of liabilities, from which the treasurer could claim to be relieved, by the clerk's assumption of them. There would have been some recognition of the fact at the treasury in Washington, if the clerk had been constituted a receiving. safe-keeping, or disbursing officer. He would have been called on, as by law all such officers are called on, to render his accounts. to declare from time to time what moneys he had received, to exhibit vouchers for his disbursements, and thus to define the extent of his liability to the United States. But whatever may have been the terms or the usage, or the understanding, which proposed to set forth the prisoner's duties as a clerk, they could not absolve the treasurer from that legal custody with which the act of congress and his commission had invested him. The clerk's possession, whatever it was, was in law the possession of the treasurer; and the clerk's liabilities therefor, upon the facts found by the jury, are those of a servant merely, not of a person either "charged" or "entrusted by law," with the safe-keeping, transfer or disbursement of the public moneys.

The case is one to which the statute does not extend and the rule must therefore be made absolute.