CHARLES H. PHELPS, Plaintiff in Error, v. THE PEOPLE OF
THE STATE OF NEW YORK, Defendants in Error.

An indictment for a statutory offense, which avers the offense as the stat-
ute defines it, is sufficient. All the circumstances which constitute the
definition of the offense, as given in the statute, must be stated, but no
others are required.

When the value of a thing, which is the subject of the offense, is necessary
to fix the grade of the offense, it is a proper mode of stating it to aver
that the thing is of, or more than, the value prescribed by the statute.

In an indictment, therefore, for grand larceny in stealing a draft, it is not
necessary to aver that there was any money due upon or secured by the
instrument or remaining unsatisfied upon it, or which might in any con-
tingency be collected thereon; it is sufficient in this respect to aver that
the draft was of the value of twenty-five dollars, or of a value specified
greater than that sum. The elements which make up the value
are not part of the offense and need not be averred.

The provision of the statute (2 R. S., 679, § 66), declaring, that "if the
property stolen consist of any  *  *  *  draft  *  *  *  the money
due thereon, or secured thereby and remaining unsatisfied, or which in
any contingency might be collected thereon,  *  *  *  shall be deemed
the value," does not make part of the description of the offense, but
simply furnishes a mode of proving it.

The intent and the act may be averred in the words of the statute — i. e.,
that the accused did feloniously steal, take and carry away (2 R. S.,
679, § 63), and the setting forth a full and precise copy of the instrument,
with the indorsements thereon, is sufficient as a description of the
property, and as showing it to be one of the species included in the
term personal property, as defined by the statute, to wit, a written
instrument by which a pecuniary obligation is "created, acknowledged,
transferred," etc. (2 R. S., 702, § 33.)

The English statute, concerning the larceny of instruments for the payment
of money, and our own, distinguished.

The provision of the act of 1855, in relation to the collection of taxes, etc.
(title 1, § 3, chap. 427, Laws of 1855), providing that payment of the
State tax by a county treasurer "may also be made by depositing such
money to the credit of the treasurer of this State," etc., does not limit
such payment to the mode specified; any mode which brings the money
to the official custody of the State Treasurer is lawful and proper.

It is not necessary that an indictment for larceny should name as owner
one who has the general ownership; it is sufficient if one be named who
has a special property in the property stolen.

So, a bailee of property may be named as owner, and this as well where
the character of bailee arose from the fact that the thing came into his
actual possession and control fortuitously or by mistake, as where it was
created by express agreement.

Where property comes into the possession of a public officer, by reason of his official position, and in accordance with the usage of his office, although it is not made by law the duty of his office to receive it, he owes a duty of ordinary care in the preservation of it, and occupies the position of a bailee in reference to it.

So, where the article comes to the office rooms of a State officer in the regular course of business, and is received by a subordinate or employee appointed or continued by the officer and removable at his pleasure, and whom he has permitted to receive such articles, this puts upon him the same duty of ordinary care.

A special interest thus acquired by a State officer is the interest of the State, and in an indictment for stealing the article, it is proper to aver ownership in the State.

Where one who occupies the position of agent to the owner of property commits its custody to a servant of the owner, the possession of the agent and servant is the possession of the owner; and if the servant converts the property to his own use, it is larceny, although he had no felonious intent when he received it into his custody.

P. plaintiff in error was indicted for grand larceny in stealing a draft. It appeared upon the trial that the draft, in pursuance of a custom in the payment of the State tax, and for the purpose of making such a payment, was transmitted by a county treasurer, to whose order it was made payable, and by whom it was indorsed to the Comptroller of the State; it was received at the office of the Comptroller by G., "second deputy comptroller," a lawful office (chap. 748, Laws of 1866, p. 1608), of which G. was a lawful incumbent, with power to perform any duty put upon him by the Comptroller (1 R. S., 117, § 7), the latter officer had sanctioned the indorsements of such drafts by G. to the State Treasurer. G., as second deputy comptroller, indorsed the draft in question to the State Treasurer, and either personally or by messenger delivered it to P. in the office of the treasurer. P. was employed in that office as "cashier." It was his duty to receive such drafts and moneys and to deposit them daily in bank. He did not deposit this draft, but converted it to his own use. *Held*, that he was properly convicted of larceny, the offense charged.

Also, *held*, that ownership of the draft was properly averred to be in "the State of New York;" that, in the absence of positive requirement, that designation, as well as "The People of the State of New York," indicated the sovereignty whose rights had been affected.

Where one called as a juror upon a criminal trial, on challenge for principal cause, testifies that he has formed and expressed an opinion, but that he believes he can render an impartial verdict according to the evidence, unbiased and uninfluenced by the previously formed opinion, he is competent as a juror, under the act in relation to challenges of jurors. (Chap. 475, Laws of 1872; chap. 427, Laws of 1873.)

(Argued January 15, 1878; decided February 5, 1878.)

Error to the General Term of the Supreme Court, in the third judicial department, to review two judgments, affirming judgments of the Court of Oyer and Terminer in and for the county of Albany, each convicting the plaintiff in error of the crime of grand larceny. (Reported below, 6 Hun, 401.)

Both indictments were for stealing drafts, the one for $7,500, the other for $400. The indictment upon the first draft contained forty-eight counts. The following is a copy of the first count:

" City and County of Albany, *ss.* :

" The jurors for the people of the State of New York, in and for the body of the city and county of Albany, being then and there sworn and charged upon their oath, present : That Charles H. Phelps, late of the first ward of the city of Albany, on the eleventh day of August, in the year of our Lord one thousand eight hundred and seventy-three, in the city of Albany, in the county of Albany, with force and arms, one bill of exchange, made and drawn by S. C. Lewis, secretary of the Farmers and Mechanics' Savings Bank, of the city of Lockport, a corporation incorporated under the laws and statutes of the State of New York, upon and directed to the Central National Bank, of the city of New York, to the effect and in substance, among other things, as follows, that is to say :

" $7,500.00.
" FARMERS AND MECHANICS' SAVINGS BANK,
         "No. 3026.
         " Lockport, N. Y., *August* 7, 1873.
" Pay to the order of S. Curtis Lewis, county treasurer, seventy-five hundred dollars.
         " S. C. LEWIS, Secretary.
" To Central Nat'l Bank, New York.

"Which bill of exchange was stamped with a two-cent United States internal revenue stamp, and was indorsed to

the effect and in substance, among other things, as follows,
that is to say :

" Pay Nelson K. Hopkins, Comptroller, or order.
                    " S. CURTIS LEWIS, Co. Treas.
    " Pay order of State Treasurer.
                    "HENRY GALLIEN, 2 Dep. Comp.

    " Of the value of seven thousand five hundred dollars, of
the moneys, goods, chattels and personal property of the
State of New York, then and there being found, feloniously
did steal, take and carry away, to the great damage of the
said State of New York, against the form of the statute in
such case made and provided, and against the peace of the
people of the State of New York and their dignity."
    The second count is similar in form, but charges the instru-
ment to have been the property of " Thomas Raines," indi-
vidually.    The third charges it to have been the property of
" Thomas Raines, as Treasurer of the State of New York."
The fourth charges the instrument to have been the property
of " Nelson K. Hopkins," individually.    The fifth charges
it to have been the property of " Nelson K. Hopkins, as
Comptroller of the State of New York."    The sixth charges
the instrument to have been the property of " some person
whose name is to the jurors aforesaid unknown."    Then fol-
low six similar counts, charging the instrument to be a
" draft ;" six charging it to be " an order," and six charging
it to be an " evidence of debt."    The next twenty-four counts
are similar, except that instead of setting out a copy of the
instrument in *haec verba*, the substance thereof is charged.
    The following facts were proven upon the trial :    In 1873
Nelson K. Hopkins was Comptroller of the State, and Henry
Gallien was acting as second deputy comptroller ; he entered
upon the duties of that office under a written appointment by
William F. Allen, a former Comptroller, continued verbally by
Messrs. Nichols and Hopkins, his successors.    The first deputy
was sick and unable to perform any of the duties of his position.
    SICKELS.—VOL. XXVII.    43

Thomas Raines was Treasurer of the State, and Fulton Paul was his deputy. On the first of February, 1872, the plaintiff in error was verbally appointed by Mr. Raines a clerk in the Treasurer's office, in which capacity he acted, with the title of "cashier," until about the first of October, 1873. He was the clerk in the Treasurer's office who received moneys and drafts for the State. His duty was to deposit the same in the proper bank of deposit in the city of Albany on the day of receipt. In August, 1873, all deposits were required to be made in the Commercial National Bank, in the city of Albany. Phelps had no authority to indorse drafts or other commercial paper. Raines did not know, until October, 1873, that he had been doing so ; nor was the fact known at the Comptroller's office, although, in fact, he had indorsed considerable of such paper. The Comptroller's and the Treasurer's offices were in the same building. The usual course of business at the Treasurer's office, when money or drafts were received for taxes of any county, was to enter the fact of such reception in two books. 1. A book wherein the demands of the State against the county, and the credits against the same were entered ; and, 2. In the book of daily cash receipts. On the 7th of August, 1873, the Farmers and Mechanics' Savings Bank issued the draft in question. S. Curtis Lewis, the county treasurer of Niagara county, indorsed it, as set forth in the indictment, and inclosed it with a letter to Mr. Hopkins, at Albany, in part payment of taxes due from the county of Niagara to the State. The draft and letter were received at the Comptroller's office August eighth, the draft was indorsed by Gallien, the second deputy comptroller, and either taken by him or sent by a messenger to the Treasurer's office, and delivered to Phelps, or the person in charge of his desk. Phelps, on the 8th of August, 1873, duly credited Niagara county upon the Treasurer's books, in his account with that county, with the draft, entered the receipt of the amount thereof in the book of daily cash receipts, and filled out a blank receipt (which had been signed by Fulton Paul, the deputy,) to Lewis, as county treasurer, for the

amount of the draft, which he forwarded to Lewis by mail.

The defendant indorsed the draft: "Pay C. Hudson, Esq., cashier or order, State Treasurer, per C. H. Phelps, Cash'r," and appropriated it to his own use. About October 1, 1873, Phelps fled from the State, he being at the time a defaulter to a large amount.

Jehial Lamb was called as a juror, and was challenged for principal cause by the prisoner, and being sworn on such challenge, testified as follows:

Q. Do you understand that defendant is now to be tried for stealing a draft? A. Yes.

Q. Heard the matter talked about in public? A. Yes.

Q. Talked about it yourself? A. Generally say a little something when convenient.

Q. At many times? A. Not a great many.

Q. Did you attend the trial a few days ago? A. No.

Q. Know he has been tried? A. Yes.

Q. Read account of the trial? A. Part of it.

Q. Have you formed or expressed an opinion of his guilt or innocence? A. I expressed an opinion from what I read.

Q. Do you entertain it still? A. I do.

Q. If you should be on this jury, you would commence with an impression upon your mind, resulting from that opinion? A. I could not very well do otherwise.

*Cross-examination:*

Q. All you know about it is what you have heard talked, and what you have read in the paper? A. Yes.

Q. You do not know Phelps? A. No; never saw him until this morning.

Q. You have no interest in it at all? A. No.

Q. Is the effect of that anything more than an impression? A. Nothing more than an impression.

Q. Do you think if you were sworn as a juror, an impression formed in that way would influence your action as a sworn juror? A. No; I should not think it would.

Q. Sworn as a juror, do you verily believe you could hear

the testimony, and give a true verdict according to the evidence ?    A. I should try to do so.

Q. Do you verily believe you could give a true verdict as a sworn juror, according to the testimony in the case ?    A. Well, I should think I could.

Q. Have you any doubt but you could pronounce a verdict upon the evidence uninfluenced by any impression you have ?    I think so.

Q. Don't you think you could pass upon the evidence, as free and unbiassed as if you had never heard of the case ?    A. I do not know as to that.

Q. Don't you believe you could pass upon the evidence just as free from bias as if you had never heard of it ?    A. I should hardly think I could.

Q. The question is, whether you, as a juror, could act independent and uninfluenced ?    A. I said I hardly thought I could.

Q. You think it would bias your mind ?    A. In a measure.

Q. (By the Court.)    Do you verily believe that you can render an impartial verdict, according to the evidence submitted to you upon this trial ?    A. I think I could.

Q. Do you verily believe that your previously formed opinion or impression will not bias or influence your verdict ?    A. I don't think it would ; I would not calculate it should ; it might, but I would not intend to do it

Q. Do you verily believe that your previously formed opinion or impression will not bias or prejudice your verdict ?    A. No ; I don't think it would.

Q. Then you think you can render an impartial verdict in this cause according to the evidence, uninfluenced by any previously formed opinion or impression, and without being biased in any way by that previously formed opinion or impression ?    A. I think I could do, and would try to do it, and think I could, but it's a pretty hard question to answer, to say I know I could.

The court held and decided the juror to be competent, to

which decision the counsel for the prisoner duly excepted, and he was sworn as a juror.

Further facts appear in the opinion.

*William J. Hadley*, for plaintiff in error. The court erred in overruling the challenge to the juror Lamb. (Laws 1872, p. 1133; Laws 1873, p. 681.) There was no count in the indictment upon which the conviction could be sustained. (2 R. S. [3d ed.], 765 m. p.; *People* v. *Loomis*, 4 Den., 381; 3 Ch. Cr. L., 974, 975, m. p.; *Rex* v. *Craven*, R. & R. Eng. Cr. Cas., 14; *Rex* v. *Chard*, id., 488, note *a.*; *Rex* v. *Clark*, id., 181; *Rex* v. *Walsh*, id., 215; *Rex* v. *Pooley*, id., 12; *Reg.* v. *Craddock*, 2 Den. Cr. Cas., 38; *People* v. *Holbrook*, 13 R., 96; 1 Arch. Cr. Pl. [W.'s 6th ed.], 85; 2 id., 391–393; *Rex* v. *James*, 7 Car. & P., 556; *Stewart* v. *Comm.*, 4 S. & R., 194; *The St.* v. *Thomas*, 2 McC., 527; Barb. Cr. Law, 688, 689; *Wood* v. *People*, 53 N. Y., 511; *Johnson* v. *People*, id., 512; 3 Greenl. on Ev., § 10.) To constitute a good indictment for larceny, the name of the true owner of the thing stolen, if known, should be stated. (The Floyd Acceptances, 7 Wal., 667; *Lee* v. *Munroe*, Cranch, 366; Laws of 1843, chap. 44, p. 28; *Jeff. Co.* v. *Ford*, 4 Green [Iowa], 376; *Ford* v. *Jeff. Co.*, id., 273.) If the State ever acquired any interest in, or right of, property to the draft, it should have been averred to be the property of the people of the State. (Const., art. 1, § 11; art. 3, § 14; 1 R. S., 173 m. p., §§ 16, 17; id., 172, § 19; id., 174, § 32; id., 175, §§ 36, 51; 1 Whart. Cr. L. [7th ed.], §§ 250, 259; *People* v. *Bennett*, 37 N. Y., 124, 125.) To constitute larceny, the alleged owner of the thing stolen must have either the actual or constructive possession of it at the time of its conversion. (2 East. P. C., 570–574, 655, 665; 2 Bish. Cr. L., §§ 356, 365, 828, 832, 854, 855. The name of the owner of the draft being ascertainable, a conviction upon the counts alleging an unknown ownership was clearly illegal. (3 Chitty Cr. L. [5th Am. ed.], 949; 1 id., 211–213; 2 East. Cr. Pl., 651; 1 Bish. on Cr. Pro.,

§§ 546–581 ; Rosc. Cr. Ev. [Sharewood's 5th Am. ed.], 640 ;
1 Whart. Cr. L., §§ 251, 256, 258 ; 2 id., 1820 [c], 1821
[d] ; Wood v. People, 59 N. Y., 117.) The taking and con-
version of the instrument in question did not amount to lar-
ceny within the true and legal definition of that crime. (3
Coke's Inst., 98, 107, 108 ; 1 Hawk. P. C., b'k. 1, ch. 33,
§§ 2, 3 ; 1 Hale Cr. Pl. [1st Am. ed.], 667 ; 2 Russ. Cr. L.
[4th Am. ed.], 95 ; Rosc. Cr. Ev. [5th ed.], 584, 594–596 ;
People v. McDonald, 43 N. Y., 63, 64 ; Hildebrand v. Peo-
ple, 56 id., 394–397 ; 2 Bl. Com., 389, 396 ; People v. Ben-
nett, 37 N. Y., 188 ; Coats v. People, 22 id., 245 ; Comm.
v. King, 9 Cush., 284 ; Waite's Case, 1 Leach. Cas. in Cr. L.,
33 ; Bazeley's Case, 2 id., 973 ; Wilson v. People, 39 N. Y.,
461 ; Smith v. People, 53 id., 111; Barrett v. Warren, 3 Hill,
348 ; Ely v. Ehle, 3 N. Y., 506 ; Reg. v. Orlanda Masters,
1 Den. Res. Cr. Cas., 339 ; Rex v. Walsh, 4 Taunt., 258 ;
1 Showers' R., 53 ; 1 Moody Cr. Cas., 129, 160, 473 ; Rex
v. Hawtin, 7 C. & P., 281 ; Rex v. Thomas, 9 id., 741 ;
Reg. v. Gorbutt, 1 D. & B. Cr. Cas., 166 ; Reg. v. Essex,
id., 371 ; Reg. v. Green, 1 Dears. Cr. Cas., 323 ; Rex v.
Thistle, 2 C. & K., 841 ; Reg. v. Glass, 1 Den. Cr. Cas., 219 ;
Reg. v. Lovell, 2 M. & R., 236 ; Reg. v. Cornish, 33 E. L.
& Eq., 527 ; Comm. v. King, 9 Cush., 284 ; People v. Ander-
son, 14 J. R., 294 ; People v. Cogdell, 1 Hill, 94 ;
Reg. v. Thurborn, 1 Derm. Cr. Cas., 387 ; Reg. v. Pres-
ton, 2 id., 353 ; Rex v. Leigh, 2 East., 694 ; Rex
v. Mucklow, 1 Moody Cr. Cas., 166 ; Reg. v. Deaves,
11 Cox Cr. Cas., 227 ; Wilson v. People, 39 N. Y.,
459.) To constitute larceny of a written instrument
the paper must be effective and operative when taken.
(Canal Bk. v. Bk. of Albany, 1 Hill, 287; Morgan v. Bk.
of State of N. Y., 1 Duer, 435; 1 Kern., 404; Doubleday
v. Kress, 50 N. Y., 410; People v. Loomis, 4 Den., 385.)
It was error to charge that the jury were unauthorized to
find that Phelps was the possessor of the draft, if they found
that it was sent from the county treasurer to the Comp-
troller, received by him for the State, delivered to Phelps in

the Treasurer's office, entered by him upon the books, and receipt sent for it ; and also in charging that it was not important whether Phelps formed the intent to steal the draft at the moment he received it ; it was enough that he formed the intent, and did steal it after it had been reduced to the actual possession of the State. ( *Wilson* v. *People*, 39 N. Y., 461; *Hildebrand* v. *People*, 56 id., 394; 1 Hale P. C., 504; 2 East. P. C., 568, 571, 572–574, 655, 665; Rosc. Cr. Ev., 594–604; 2 Whart. Cr. L. [7th ed.], §§ 1818, 1830 *a*, 1830 *b*, 1846 *b*, 1861, 1861 *b* ; 2 Bish. Cr. L., §§ 826, 828, 855; Wait's Case, 1 Leach, 33 [3d ed.]; *Bage-ley's Case*, 2 id., 973; *Abrams* v. *People*, 6 Hun, 491; *Reg.* v. *Goodbody*, 3 C. & P., 665.) The court erred in refusing to charge that if the draft came into Phelps' possession lawfully in the course of his employment as money or receiving clerk of the treasury department, and that as such clerk he had a right to keep it for the purpose of and until deposited in the State bank of deposit, he was not guilty of larceny in carry-ing it away and converting it to his own use. (2 East. P. C., 655, 665, 668, 669, 693, 694; 2 Bish. Cr. L., §§ 799, 828, 855; 2 Russ. on Cr., 109, 117, 118, 131, 132; 2 Starkw., 832 m. p.; Rosc. Cr. Ev., 595, 597 m. p.; 3 Chitty Cr. L., 919, 920 m. p.; 1 Leach, 32; 2 id., 973; 1 Moody Cr. C., 160 ; 9 C. & P., 741 ; 7 id., 665 ; Russ. & Ry., 441 ; 2 Whart. Cr. L., Dec. [7th ed.], 1860, 1861 *b* ; 1 Moody Cr. C., 473, 129 ; 7 C. & P., 279 ; 9 Cush., 287, 288; *People* v. *Anderson*, 14 J. R., 296, 297.) The court erred in refusing to charge that the prisoner could not be convicted under any or either of the counts charging the draft to be the property of some unknown person. (2 East. P. C., 651; 3 Chitty Cr. L. [5th N. Y. ed.], 949; 1 id., 213 m. p.; 2 Russ. on Cr., 162; Rosc. Cr. Ev., 640; 2 Arch. Cr. Pld'gs, 391–393 [6th N. Y. ed.], 4 Den., 380–384; 53 N. Y., 511, 514; 55 id., 512; 3 Greenl. Ev., § 10; 5 Den., 76; 3 Ch. Cr. L. [5th Am. N. Y. ed.], 974, 974 *a;* 2 East. Pl. Cr., 601; R. & R. Cr. Cas. [14 ed.], 488, note *a*; id., 12; id., 215.)

*Nathaniel C. Moak*, for defendants in error. The exceptions to the ruling of the court that Lamb, Bailey and Taylor were competent jurors were not well taken. (*Stokes* v. *People*, 53 N. Y., 164, 171, 173; *Palmer* v. *People*, 36 id., 279; *Lowenberg* v. *People*, 5 Park., 423, 424; *State* v. *Pike*, 49 N. H., 406, 407; *Cooper* v. *State*, 16 Ohio St., 330–334; *State* v. *Millain*, 3 Nev., 428–430; *Eberhart* v. *State*, 47 Geo., 606; *People* v. *Brotherton*, 47 Cal., 395.) The indict‑ ment was not defective, because it did not allege any amount was due upon the instrument in question or secured by it, and remaining unpaid thereon. (2 R. S., § 63, 2 Edm. Stat., 699; 2 R. S., 702, § 33, 2 Edm. Stat., 726; 2 R. S., 679, § 66, 2 Edm. Stat., 699; *State* v. *Gorham*, 55 N. H., 152; *People* v. *Bennett*, 37 N. Y., 120, 121; *People* v. *Rynders*, 12 Wend., 431, 432; *Low* v. *People*, 2 Park. Cr., 40, 41; *Holmes* v. *People*, 15 Abb. Pr., 159; *Mapes* v. *People*, 69 Ill., 431; 2 R. S., 728, § 52, 2 Edm. Stat., 751; *Tomlinson* v. *People*, 5 Park. Cr., 320; *People* v. *Loop*, 3 id., 559; *Quinlan* v. *People*, 6 id., 9; *Wilson* v. *People*, 5 id., 178; *Haskins* v. *People*, 16 N. Y., 344, 347, 348; Rosekrans, 5 N. Y. [Sup. Ct. R.], 467, 475; *People* v. *Clements*, 26 N.Y., 197, 198; *State* v. *Davis*, 41 Iowa, 311; *Rex* v. *Sommerton*, 7 B. & C., 463.) The point that neither the State, the Comptroller nor Treasurer acquired any interest in, or title to, the draft in question was not well taken. (*People* v. *Sherwin*, 2 N. Y. [Sup. Ct. R.], 578; *People* v. *Bennett*, 37 N. Y., 124, 129–132; 2 Bish. Crim. Prac. [2d ed.], §§ 720–723; 2 Whart. Cr. L. [6th ed.], § 1,818; *Ward* v. *People*, 3 Hill, 395; 6 id., 144; *Comm.* v. *Finn*, 108 Mass., 466.) The property in the draft was properly laid in the people of the State of New York. (2 R. S., 703, §§ 35, 36; 2 Edm. Stat., 726; 2 Story on Const., §§ 1679–1686; *Texas* v. *White*, 7 Wal., 721; 1 R. S., 165, § 15; 1 Edm. Stat., 164; 2 R. S., 552, § 13; 2 Edm. Stat., 573; *Collector* v. *Day*, 11 Wal., 124; *State of N. Y.* v. *State of Conn.*, 4 Dal., 1; 1 R. S., 65, § 3; 1 Edm. Stat., 79; id., 175, §§ 13–17; 1 Edm. Stat., 172; id., 179–181, §§ 1–17; 1 id.,

180–182.) The objection that the draft could not be proved, because the indictment did not charge it to be the property of Curtis or the treasurer of Niagara county was not well taken. (*Talbot* v. *Bank of Rochester*, 1 Hill, 295; *Currier* v. *Ins. Co.*, 53 N. H., 538; *Graves* v. *Am. Ex. Bk.*, 17 N. Y., 207.) It was immaterial whether the draft ever came to the personal possession of the State Treasurer or not. (*Comm.* v. *Lawless*, 103 Mass., 425; *Davis* v. *People*, 56 N. Y., 95, 101; *La Beau* v. *People*, 33 How. Pr., 69; *Nelson* v. *People*, 5 Park., 39; *People* v. *White*, 55 Barb., 606, 611; *Osgood* v. *People*, 39 N. Y., 449, 451; *Kane* v. *People*, 8 Wend., 210, 211.) Defendant having been convicted on all the counts, if there were a single good count, the conviction was valid, and will not be reversed. (*People* v. *Davis*, 56 N. Y., 95, 100; *Crichton* v. *People*, 6 Park. Cr., 363, 366, 369; 1 Keyes, 344; 1 Abb. [Ct. App. Dec.], 470; *Gunther* v. *People*, 24 N. Y., 100; *People* v. *Stein*, 1 Park. Pr., 204; *Baron* v. *People*, id., 246; *People* v. *Gilkinson*, 4 id., 26; *La Beau* v. *People*, 33 How. Pr., 70; *Fraser* v. *People*, 34 Barb., 306, 308; *People* v. *Herrick*, 13 Wend., 91, 92; *Bretschofsky* v. *People*, 3 Hun, 40; 60 N. Y., 616; *Lyons* v. *People*, 68 Ill., 272; *Latham* v. *The Queen*, 2 Cox Cr. Cas., 516; *Cooke* v. *State*, 49 Miss., 9; *Estes* v. *State*, 55 Geo., 131; *Adams* v. *State*, 52 id., 565; 1 Bish. Cr. Prac. [2d ed.], § 1015; 3 Whart. Cr. L. [7th ed.], §§ 3208, 3209; *Chappell* v. *State*, 52 Ala., 359; *People* v. *Gonzales*, 35 N. Y., 60; *People* v. *Haynes*, 13 Wend., 568, 569.) It was immaterial whether or not the prisoner could have been properly convicted under the counts charging the property in the draft to be in Raines individually, or as treasurer. (35 N. Y., 60; *Rex* v. *Abrahat*, 2 Leach [4th ed.], 824; *Rex* v. *Spears*, id., 825; *Reg.* v. *Reid*, Dearsby's C. Cas., 257, 262–266; 2 Com. Law, 607; *Reg.* v. *Bunkall*, 9 Cox Cr. Cas., 419; Leigh & Cave, 371, 377, 378.) The point that the prisoner came lawfully to the possession of the draft, and therefore could not be convicted of larceny, was not well taken; he was simply the custo-

dian of it. (*Coates* v. *People*, 22 N. Y., 245; 1 R. S.,
176, § 1; 1 Edm. Stat., 177; id., 177, § 7; id., 178;
id., 178, §§ 10, 11, 12, 13; id., 178; Laws 1831, chap. 320,
§ 21, p. 423; 3 Edm. Stat., 71; *U. S.* v. *Hutchinson*, 7
Penn. L. J., 365; 4 id., 211; *Comm.* v. *Hutchinson*, 2 Pars. &
Sel. Cas., 384; *Reg.* v. *Wright*, D. & B. Cr. Cas., 431; *Reg.*
v. *Watts*, 2 Den. C. C., 14; Temple & Mew., 342; 1 Eng.
L. & Eq., 558; *Rex* v. *McNamee*, 1 Moody C. C., 368; *Reg.*
v. *Harvey*, 9 C. & P., 353; *Reg.* v. *Jackson*, 2 Moody C. C.,
32; *Rex* v. *Robinson*, 2 East., 565; 2 Deacon's Cr. L., 750,
§§ 46, 47; *Rex* v. *Mary Jones*, 7 C. & P., 151; *Deakin's
Case*, 2 Leach, 870; *Aickle's Case*, 1 id., 302; *Reg.* v.
*Thompson*, L. & C., 225; 32 L. J. M. C., 53; *Hildebrande*
v. *People*, 56 N. Y., 394; *Rex* v. *Bass*, 2 East., 566; 1
Leach, 251; 270; 344; *Vale* v. *Boyle*, 1 Cowp., 294; *Rex*
v. *William*, 6 C. & P., 390; Cald., 295; *Rex* v. *Brazier*, R.
& R., 337; *Rex* v. *Hammon*, 4 Taunt., 304; R. & R., 221;
2 Leach C. C., 1083; *Reg.* v. *White*, 9 C. & P., 344; *Rex*
v. *Paradice*, 2 East., 565; *Richards* v. *Comm.*, 13 Grat.,
806-810; *Queen* v. *Hennessey*, 35 Up. Con. [Q. B.], 603;
*Rex* v. *Lavender*, 2 Rus. on Cr., 160; *Chipchases's Case*, 2
East, 567; 2 Leach, 699; *Rex* v. *Spear*, 2 East, 568; 2
Leach, 825; *Reg.* v. *Smith*, 1 Car. & K., 423; *Reg.* v. *Mid-
dleton*, 5 Eng. R., 406; Allison's Prin. & Prac. Cr. L. of
Scotland, 251, 252, 259; McDonald's Cr. L. of Scotland,
48-54; 1 Hawk. Pl. Cr. [Cerwood's ed.], b'k. 1, chap. 33,
§§ 4-22, pp. 208-211; 2 East Pleas Crown, 564-568; Rosc.
Cr. Ev. [7th Eng. ed.[, 617-621; Rosc. Cr. Ev. [6th Am.
ed.], 585-589; 2 Rus. on Crimes [8th Am. ed.], 21-24;
Archb. Crim. Plead. & Ev. [17 English ed.], 333-340; 2
Bishop's Criminal Law [5th ed.], §§ 824, 832, 854-869;
Bish. Stat. Crimes, § 635; 2 Whart. Cr. L. [6th ed.], §§ 1840-
1846; 2 B. & H. L. Cr. Cas. [2d ed.], 192-197; *People* v.
*Call*, 1 Den., 120; *Ellis* v. *People*, 21 How. Pr., 356; *Peo-
ple* v. *Bennett*, 37 N. Y., 117, 124, 125; *People* v. *McDonald*,
43 id., 64; *Cobletz* v. *State*, 36 Tex., 353; 1 Green's Cr. R.,
646; 36 Texas, 355; *Walker* v. *Comm.*, 8 Leigh, 743;

Smith's Syn. Discriminated, tit. Possess.; Graham's Syn., tit. Possess.; Bouv. L. D., tit. Possess.; Wedgwood's Dict. Eng. Etymology [2d ed.], tit. Possess.)    Even if plaintiff in error acquired possession of the draft, instead of the care or custody of it, such possession would not have protected him, if, when he obtained it, he did so with intent to steal it. (3 Burn's Justice [30th ed.], tit. Larceny, 204, 207; 2 Bish. Cr. L. [5th ed.], §§ 813, 862; 2 Whart. Cr. L. [6th ed.], § 1847; *Reg.* v. *Middleton,* 4 Eng. R., 536; 12 Cox Cr. Cas. 260; *Reg.* v. *Slowby,* 4 Eng. R., 545; *Ellot* v. *Comm.,* 12 Bush [Ky.], 176; *Reg.* v. *Ewing,* 21 Up. Con. [Q. B.], 523; *State* v. *Thurston,* 2 McMul., 394–396; *State* v. *Gorman,* 2 N. & McC., 90; *People* v. *Smith,* 23 Cal., 280, 281; *People* v. *Jersey,* 18 id., 337; *People* v. *Poggi,* 19 id., 600.) The court properly refused to charge that the prisoner could not be convicted unless he had formed an intent to steal the draft when it first came into his custody.    (43 N. Y., 66; 21 How. Pr., 359; 1 Den., 120; 2 Pars. Sel. Cas., 384.) The point that plaintiff in error could not be convicted because the draft had not been legally indorsed by the State Treasurer, so as to vest a legal title in the thief, was not well taken.    (*Chipchase's Case,* 2 Leach ['4th ed.], 699; 1 Hawk. Pleas Crown [Curwood's ed.], 196; 3 Chitty's Cr. L., 932.) It is the duty of the court in a criminal case to decide a question of law, when there is no conflict in the evidence or dispute as to the facts.    (*U. S.* v. *S. B. Anthony,* 11 Blatch., 209–212 ; *People* v. *Bennett,* 49 N. Y., 137 ; *Comm.* v. *Magee,* 12 Cox Cr. Cas., 549.)    An intent to ultimately repay the money after using it, and running the risk of loss, would not protect the plaintiff in error. (2 Whart. Cr. L. [7th ed.], §§ 1789, 1841 ; *Reg.* v. *Treblock,* 7 Cox Cr. Cas., 408 ; D. & B., 453 ; *Reg.* v. *Phetheon,* 9 C. & P., 552; *Reg.* v. *Cummings,* 16 Up. Can. [Q. B.], 24; *Comm.* v. *Stebbins,* 8 Gray, 492; *State* v. *Bond,* 8 Iowa, 540; *Reg.* v. *Hall,* T. & M., 47; 1 Den. C. C., 381; 1 Bish. Cr. L. [6th ed.], § 343; 2 id., § 841; *Reg.* v. *Phillips,* 2 East., 662; 2 C. & K., 942; *Comm.* v. *Mason,*

105 Mass., 163; *Comm.* v. *Tenney*, 97 id., 58; *Comm.* v. *Coe*, 115 id., 482; *People* v. *McDonald*, 43 N. Y., 63; *Reg.* v. *Holloway*, 2 C. & K., 942, 947, 949.) No custom or usage by a public officer can authorize the doing of an illegal act by himself or any subordinate. (*Bellinger* v. *Gray*, 51 N. Y., 621; *U. S.* v. *Hutchinson*, 7 Penn. [L. J.], 369, 370; 4 id., 217; *U. S.* v. *Taintor*, 11 Blatch., 374; id., 200, 210, 211; *Hamilton* v. *People*, 57 Barb., 625; 2 Whart. Cr. L. [7th ed.], § 1865 *a*; 16 Up. Can. [Q. B.], 25; *Comm.* v. *Doane*, 1 Cush., 5.) The point that the Farmers and Mechanics' Savings Bank of Lockport had no right to issue the draft was not well taken. (*Mech. Bk.* v. *Spring Valley*, *etc.*, 25 Barb., 419; *Conn., etc.*, v. *Cleveland, etc.*, 41 id., 9; *Nelson* v. *Eaton*, 26 N. Y., 410: Morse on Banking, 1, 4–6; *Curtis* v. *Leavit*, 15 N. Y., 9; *Smith* v. *Law*, 21 id., 298, 299; 2 S. L. 1870, p. 2002, § 9; id., 2004, § 16; *Parish* v. *Wheeler*, 22 N. Y., 494; 2 S. L. 1868, p. 1998.) It was not necessary to set out in the indictment an indorsement on the draft after it was stolen. (*Comm.* v. *Coe*, 115 Mass., 481, 500, 501; 3 Chitty Cr. L., 974, note.) Evidence tending to prove any fact constituting an element of a crime charged in an indictment is competent, although it may tend to prove the prisoner guilty of some other crime. (*Weed* v. *People*, 56 N. Y., 628; *Cofferman* v. *People*, 3 N. Y. S. C. R.; 56 N. Y., 591; *Rex* v. *Moore*, 2 C. & P., 235; *Reg.* v. *Briggs*, 2 M. & R., 199.)

FOLGER, J. The prisoner was indicted for grand larceny, and was convicted thereof and sentenced to the Albany Penitentiary. The article which it was alleged that he stole was an instrument in writing known as a draft, on a bank in New York city, from a savings bank in Lockport, N. Y. It was for $7,500, made payable to the order of S. Curtis Lewis as county treasurer of Niagara county, indorsed by him, payable to Nelson K. Hopkins, Comptroller, or order. It was further indorsed by Henry Gallien, as Second Deputy Comptroller, payable to the order of the State Treasurer. It was

sent by that county treasurer, by mail, from Lockport, to the Comptroller of the State of New York, to be credited to the account of Niagara county, on State tax due from that county to the State. It came to the hands of Gallien, who claimed to act in the receipt of it as a second deputy to the Comptroller. It went from his hands, either directly or by the hand of a messenger, to the hands of the prisoner. He converted it to his own use. He was at the time a servant of the State, in the office of the State Treasurer. He was called "cashier." His employment was to receive such drafts and moneys as came to that office, and to make deposits of them daily in bank, at such time in bank hours, after the middle of the day, as suited him. He made no such deposit of this draft.

From the judgment of the General Term, affirming the conviction, a writ of error has been brought to this court.

Upon the facts above stated, and upon others which will appear in this opinion, an able argument has been made in his behalf, which presents some grave and close points.

The first point to be noticed is that which claims that the draft, which was alleged to have been the subject of the larceny, was not properly described in the indictment. The fault indicated is, that there is no averment that there was any money due upon or secured by the draft, or remaining unsatisfied upon it, or that might in any contingency be collected thereon ; which is the substance of one of the sections of the Revised Statutes cited below.

To steal such an instrument was not larceny at common law. It is made so by statute. The definition or description of the offense is contained in the statute. If the indictment avers the offense, as the statute defines it, the averment is sufficient. For the rule is, that, while in framing an indictment on a statute, all the circumstances which constitute the definition of the offense in the statute itself, so as to bring the accused precisely within it, must be stated ; yet no other description of the thing in which the offense was committed is necessary to be stated, than that contained in the statute

itself, unless the value becomes necessary to fix the grade of the offense. (2 Leach, 1103.) And the mode of stating the value, is to aver that the thing which is the subject of the offense is of or more than the value prescribed by the statute as the sum which must be reached in value. It must be laid in the words of the act creating the offense, or at least in words plainly equipollent. (*Per* YEATES, J., 3 Binney, 537, *Spangles* v. *Comm;* see, also, 1 Chit. Cr. L., 281; 2 Foster, 284; 2 Leach, 1103.)

The language of the statute is : "Every person who shall be convicted of the felonious taking and carrying away the personal property of another, of the value of more than twenty-five dollars, shall be adjudged guilty of a grand larceny," etc. (2 R. S., 679, § 63.)

There is the offense — the intent, feloniously; the act, taking and carrying away; the subject of the act, personal property of another of a certain value—these three ingredients make the crime. The intent and the act may be averred in the very words of the statute ; did feloniously steal, take, and carry away. The subject of the act must be more specifically averred, because the words of the definition are generic, and the subject of the larceny is of a species. This is to be done to meet a requirement of the common law, and not of the statute ; that the particular personal property taken shall be set forth by the name or description of its kind, for the full information of the accused ; *Rex* v. *Chalkley* (Russ. & Ry., 258) ; and to show that the chattel averred is the same as that proven.

Another section of the statute has enumerated the different species of that generic term. "The term personal property, as used in this chapter, shall be construed to mean goods, chattels, effects, evidences of rights in action, and all *written instruments by which any pecuniary obligation,* or any right or title to property, real or personal, *shall be created, acknowledged, transferred,* increased, defeated, discharged or diminished." (2 R. S., p. 702, § 33.)

Now the indictment avers that the prisoner, "with force

and arms, one draft," made and drawn by the savings bank on the bank in New York city, "feloniously did steal, take and carry away." It thus avers the intent and the act. It also describes the draft. It gives a full and precise copy of the words of it, and the words of the indorsements which were upon it, before and when it came to the hands of the prisoner, so that there can be no mistake that it is properly averred as a written instrument, by which a pecuniary obligation is created, acknowledged and transferred. Thus the averment shows that it is the personal property of the sixty-third section, by showing that it is one of the species of that term enumerated in the thirty-third section. It then avers that it was the personal property of another than the prisoner, naming in the count we now have under our eye, the State of New York as that other. It also avers that the draft was of the value of $7,500. Thus is made a complete averment of the subject of the larceny. 1st. The kind of property. 2d. The other of whom it is the property ; and, 3d. The value of the property, as over twenty-five dollars. And thus is made a complete averment of all the constituents of the statutory crime of which the prisoner was found guilty.

There is another section of the statute which is applicable to the case. "If the property stolen consist of any  *  *  * draft,  *  *  *  the money due thereon, or secured thereby and remaining unsatisfied, or which in any contingency might be collected thereon,  *  *  *  shall be deemed the value of the article so stolen." (2 R. S., § 66, *supra*.)

This section does not make any part of the description of the offense. It prescribes a rule of evidence, and furnishes a mode of proving the value of the draft stolen. It is evident that though all the other elements of the offense (the intent, the act, the kind of property, the owner) may be susceptible of easy proof, there would be difficulty in proving that a piece of paper, with words written or printed upon it, was of the value of over twenty-five dollars. Such a piece of paper, a draft for over that amount, payable to

order and not indorsed, would be valueless in the hands of a felonious taker of it, and valueless in any hands, merely as a piece of printed or written paper. Its value would be, in the evidence which the words of it gives, of an obligation to pay, and in the power which it gives to the payee to obtain the sum of money named in it. It has its worth from its relation to some other thing. (2 East P. C., 597.) So this section of the statute was needed and was adopted to make an arbitrary value to the draft, for the purposes of the criminal law, and to give a ready means of proof of that value. The offense is to steal such a paper over such a value. The fact that it is over such a value, and the proof of the averment of that fact, is in the other fact, that by force of the words of it, not yet put in use to realize upon it, there is money to more than that amount due thereon or secured thereby and remaining unsatisfied.

Now the test is this. Would not the sixty-third and thirty-third sections, above cited, if standing alone, with no aid or accompaniment from the sixty-sixth section, above cited, have created a statutory offense ? They set forth all the elements of an offense. It would have been difficult to have made proof of value, so as to bring the case up to the minimum of twenty-five dollars fixed by the statute ; but that would have been a failure of proof, not a failure of the law as not declaring an offense. The very reason of the passage of the statute, making choses in action the subject of larceny, was the rule of the common law, that their whole inherent value being the price of the paper, it was too insignificant to be worthy of punishment. (4 Bl. Comm., 234; 2 East P. C., *supra.*) Our statute has arbitrarily made them the subject of grand larceny, if the value be over twenty-five dollars; and mindful of this rule of the common law, the statute has declared that the gauge of value shall not be the worth or price of the paper on which they are written, but the power which the writing on them has to obtain money. So it is apparent that the two sections first named create and declare an offense. The rule of the common law above named does

not avail against it; because the law-making power has said (taking those two sections alone), notwithstanding that rule, stealing a chose in action will be grand larceny hereafter, if the proof can be made of value to the amount fixed; and then, seeing how great the difficulty would be of making that proof, it has further said, we also give you this new rule of value for this case. But it no more made the means by proof of showing the value, a part of the offense, than the common law did when it declared the stealing of a horse or other chattel to be larceny. There was the same rule in effect as to chattels, as there was as to choses in action; if valueless, the law did not deem it an offense to take them; so it was and is a rule that value must be averred and shown. (*Phipoes Case*, 2 Leach Cr. L., 774; Starkie Cr. Pl., 450; but see *Reg.* v. *Morris*, 9 C. & P., 349.) But the reasons why there is value to them—that is, the elements which enter into the mind of the witness in making up his judgment and testifying as to their worth, are not a part of the offense requiring an averment of them in the indictment.

It is true that the precedents of indictments in the text-books of English writers furnish an averment, of the kind claimed by the prisoner to have been faultily omitted from the indictment on which he was tried; and the rulings of English courts hold, that, without such an averment, an indictment for the larceny of a draft, or the like written instrument, is faulty. The reason for that is that the English statute (2 George II) blends in one section, the matter distributed in three sections in our Revised Statutes; and so blends it as to make it all part of the description of the offense. So it was with the Statute of South Carolina, interpreted in *The State* v. *Thomas* (2 McCord, 527), cited for the plaintiff in error. The language there is, that the stealing any instrument for the payment of money, shall be deemed felony of the same nature as it would have been, if the offender had stolen goods of like value with the money due and remaining unsatisfied on that instrument.

It is apparent that no information is given of the grade of

the offense until statement made of the amount thus due and unsatisfied. So that, if the indicted person should plead guilty to an indictment which lacked the averment of the amount due and unsatisfied, the court would have no hint from it of the grade of the offense, nor of the punishment to be inflicted. On the contrary, our statute does fix the grade of the offense. An indictment, in the language of sections sixty-six and thirty-three, gives information of what offense is charged. And so it is in England, when the statute is like ours. Thus, in *Rex* v. *Johnson* (3 Maule & Selw., 539), the indictment charged the prisoner with stealing nine bank notes for the payment of divers sums of money, amounting in the whole to a certain sum of money, to wit, the sum of nine pounds of lawful money, and of the value of nine pounds. Lord Ellenborough, C. J., said: " If bank notes be recognized by that description in an act of Parliament, the indictment has done enough in laying them under such a description; " and Le Blanc, J., said: " Where a specific thing is made the subject of larceny, it is only necessary to describe it as such specific thing, it being a species of thing which is the subject of larceny. It may be said of a bank note, it is not necessary to describe it particularly as a bank note for the payment of one pound, five pounds or twenty pounds; because, for whatsoever sum it may be payable, it is still a bank note. The argument upon this part of the case has arisen from the practice of describing the particular sum for which the note is payable, and *that the money secured thereby is unsatisfied.* The answer is, that whether it be payable for one sum or another, it is equally a bank note, and a bank note is the subject of larceny. No further description is necessary, than for other chattels which are the subject of larceny, and under the general name of bank note, the particular species, if the sum for which the note is payable may be said to constitute a species, may be proved." And see *Milnes' Case* (2 East Cr. L., 602), where an indictment, charging the stealing of " a promissory note for one guinea," was held *good.*

It is well to observe of the case *Holbrook* v. *The People* (13 J. R., *93), cited for plaintiff in error, that no such point as his was there decided or raised, though the indictment was such as might have elicited it. Nor does that case or *The People* v. *Loomis* (4 Denio, 380), liken our Revised Statutes to 2 Geo. II, *supra*, as is erroneously supposed. It is 1 R. L., 174, which is said to have a likeness. The latter holds only that there must be some value to the chose in action, and that some value must be proven.

In *Stewart* v. *Comm.* (4 Sergt. & R., 194), the point was not made by counsel, and it was enough for the case to have said that the notes should have been more particularly described. The case was not elaborately considered, and is not in accord with an intimation of TILGHMAN, C. J., in 3 Binney, 533.

Nor is there in our views here expressed any departure from *Wood* v. *The People* (53 N. Y., 511), where it is said that the indictment must aver all the things that make the offense. The reason of that rule is to inform the accused of the leading grounds of the charge; to enable the court to pronounce the proper judgment affixed by law to the combination of facts alleged (2 McCord, *supra*); and to enable the party to plead the judgment in bar of a second prosecution. (3 Greenl. on Ev., § 10.)

We conclude that the indictment did make sufficient averment of the subject of the larceny, and that this point is not well taken.

The next point for our consideration is this : That to constitute a good indictment for larceny, it is absolutely necessary that the name of the true owner of the thing stolen, if known, should be stated. It is claimed that neither the State of New York, nor Thomas Raines, nor Nelson K. Hopkins, nor Raines as State Treasurer, nor Hopkins as Comptroller, had any general or special property in the draft, and that it was manifestly improper to aver it to be the property of a person or persons unknown.

It is clear that it was of no avail in this case to allege that

the draft was the property of a person or persons to the jurors unknown. The grand jury had all the information of ownership which was needed to determine in whom was the ownership. As to that part of his claim, we are with the plaintiff in error; but we do not agree with the rest of it. It is claimed that the State of New York had no ownership of this draft, though it was sent by the proper official of Niagara county for the proper purpose of paying the tax indebtedness of that county to the State. And the reason given is, that the statute law does not provide for the payment of that indebtedness in the mode taken by that official; and more than that, that payment is by statute prohibited in other than one way. Reliance is had to sustain this contention upon chapter 427 of Laws of 1855, p. 781, title I, § 3. That section begins with this language: "*Such* payment may *also be made* by depositing *such* money," etc., etc., and then goes on to provide *a way* in which county treasurers may make payment of the State tax. It is plain that this is not the sole way which the law will recognize. The first phrase "*such* payment" refers to something which has gone before in the statute, and the phrase "may *also* be made," indicates that another mode of payment has been before provided or indicated; and we do find that the second section of the same title of that chapter says, that the "county treasurer shall, on or before the first day of March in each year, pay to the treasurer of the State the amount of the State tax." * * * This is a general direction or command, requiring payment, without specifying the mode, and being satisfied by any mode which brings the money for the State tax to the official custody of the State Treasurer. The duty put upon the county treasurer by this second section is to pay to the State Treasurer. If he takes the method of the third section, he fulfills that duty. He no less fulfills it, if he comes in person and lays down before the State Treasurer, in his office, the amount of the State tax in coin; and no less if he transmits by mail to that official such draft or bill of exchange, as the State

Treasurer is willing to use, to procure the money upon, and does procure the money upon it ; and no less if he transmits that draft to a private person, or to an official person, to be handed over to the State Treasurer, and the latter procures the money upon it ; or follows any other way of putting into the coffers of the State the money which is due it, which way has been sanctioned by the practice of the official agents of the State connected with its treasury and financial affairs ; provided, that thereby the money gets into the State treasury. There is no prohibition by law, on any way of making payment. So that payment is made, any way of paying is lawful. Doubtless, as is contended for the plaintiff in error, the bringing into the office of the Comptroller or the State Treasurer a draft, did not pay any portion of the State tax, but it was a step in a process of paying which had been recognized and sanctioned by official usage, as is plainly inferable from the evidence, and which would be complete when the State Treasurer had realized upon a draft transmitted. The State is not bound, if the draft proves worthless, without neglect of its agents ; nor do we say that it is bound, if that neglect makes the draft worthless ; nor is it necessary that it be held that the State acquired an absolute property in the draft. Whatever right its public agents acquired in it, they acquired for it. If that was a special and limited interest in it, still it was such an interest as that it made a proper averment to allege that the State was the owner.

It is not necessary that the indictment should name that person as owner, and him only, who has the general ownership of the property, a title absolute, which he can maintain against the whole world. It is enough, if any one be named who has a special property in the thing stolen. A special property is a qualified or limited right, such as a bailee of it has ; and a bailee of property is one to whom the thing has been delivered, to be held according to the purpose or object of the delivery, and to be returned to the bailor, or delivered over to some other, when that object has been accomplished, or for the purpose of accomplishing it ; and the obligation

of the bailee may arise by implied contract, as well as express agreement. Thus, a finder of a lost chattel or chose in action, may become a bailee of it by the act of finding and keeping it in custody. And so, too, is the recipient of a chattel or chose in action, either directly from the hands of the absolute owner, or through the intervention of a private agency such as a manager, or a public agency such as a common carrier or the government mails. Hence this character of bailee, with this special property in the thing, may arise, without any express agreement to receive and to hold for a particular purpose. It may arise from the bare fact of the thing coming into the actual possession and control of a person fortuitously, or by mistake as to the duty or ability of the recipient to effect the purpose contemplated by the absolute owner; and I see no reason why a person who is the incumbent of a public office, may not become in his official capacity, such bailee, and may not properly deliver the thing in his possession to his successor in office, charged with that continuing duty as to it which will confer on him a special interest in it. For instance, suppose that in the course of interchange of printed public statutes and other books between the States, a package from Maine, meant for the State library of this State, or for another State, addressed to the Secretary of State, should reach Albany, at the close of the last day of his term of office, and should be left at his official rooms in the State hall from the express company's delivery wagon; can it be said that he is not under a duty to the real owner, whoever it may be, to care for it through the day, and that his successor would not, on the next day, receiving it with the other property in those rooms, be subject to the same duty? The duty thus put upon them in turn, would give them in turn a special right and ownership in the property, which could be defended against all but the absolute owner. The statute law might not impose upon the Secretary of State any duty to this State in relation to the parcel; but having, by reason of his official position, had it committed to him, he is subjected to a duty to use ordinary care in

the preservation of it from loss or violence. If it be granted that he does not receive it in his official capacity, for the reason that the law does not make it a duty of his office so to do, let us then add to the facts supposed, that it has been the course of his office to take in such packages and deliver them to the proper department, or to return them if missent, does he not then owe a duty of ordinary care until one or the other of these objects has been reached ? If it be said that, in addition to the absence of law imposing such official duty, it does not appear that, in fact, the package came to his hands or his notice, does not the fact that he has permitted deputies, clerks and servants, appointed or continued by him, and removable by him at his pleasure, to receive such packages and forward or return them in orderly course, put upon him as an individual the duty of ordinary care when one comes to his office-rooms in the regular course of business. We think that there can be but an affirmative answer to these queries. And then it follows, that there was in the public officers into whose possession this draft came by being put into the custody of one of their servants or clerks, for the purpose of being converted into money for deposit in the State treasury, a duty to the county of Niagara and to its treasurer, to see that that purpose was accomplished, or the draft sent back with notice that that mode of receiving payment of State taxes would no longer be kept up. We say nothing, and have no opinion, nor intimate any, whether there has been any failure in the performance of that duty, or whether, if there has, it be excusable or not in law. There being a duty, there was a special property in the draft, accompanying that duty, so that there was a proper averment in some count of the indictment of an owner of the property. The special interest acquired by the public agents of the State was the interest of the State ; for the retiring Secretary of State, in the case supposed, could not properly take away with him the package of books. It must be left for his successor to take, by virtue of his office ; and as he takes it by virtue of his office, he takes it as the agent of the State;

and hence the State obtains and retains the special interest in the property which will sustain an averment of ownership. (*See People* v. *Bennett*, 37 N. Y., 117.)

The next two points are akin. They both turn upon the question of whether there was an actual or constructive possession of the draft in the alleged owner, the State of New York, at the time of the taking by the plaintiff in error.

It is held in *McDonald* v. *The People* (43 N. Y., 61), that if money or property is delivered by the owner to a person for mere custody or charge, or for some specific purpose, the legal possession remains in the owner, and a criminal conversion of it by the custodian is larceny. It is clear that the plaintiff in error had the draft, for the special purpose of making the proper entries on account of it in the books of the State Treasurer, and of putting it into the State deposit bank later in the day, and that all the interest he had in it until that special purpose could be accomplished was the mere charge or custody of it. He had no more than this, for that purpose could be changed by the State Treasurer, and that custody interrupted at any moment.

But it is urged that the draft came lawfully into the possession of the plaintiff in error, and that he acquired that possession before he formed the purpose of appropriating it to himself.

It is doubtless a general rule that every larcenous taking must be such as that trespass would lie therefor. Then another is, that trespass will not lie, unless the owner of the property is in the actual or constructive possession at the time of the taking. Then another, that such possession must have existed apart from the charge of the property by the custodian; and that neither the civil nor the criminal action will lie, when such possession has been had only through his custody of it. But there have been some modifications of these rules. One is, that larceny may be charged, in such case, when the felonious appropriation is after the property reaches its ultimate destination. It is doubtful whether this rule applies to this case, for the ulti-

mate destination of the draft may have been the State deposit
bank. If the ultimate destination could with certainty be
said to be the safe of the State Treasurer, then it would be
applicable. But, ordinarily, property cannot be said to have
reached its ultimate destination while it remains in the per-
sonal custody of the servant, especially if there is another
assigned place of deposit than the hands of the servant.
There is another rule which does apply — when the property
is received by the servant or custodian from another, who
occupies the relation of agent for the owner, or who stands
in the position of the owner in respect to the possession ; then,
though the owner never had the actual possession, yet the
possession of such other person is his possession. These rules
and the modifications of them were asserted by this court in
*McDonald* v. *The People* (*supra*), in an opinion delivered by
the Chief Judge. To that case reference is now had for the
discussion of them.

Now, in the case in hand, the draft came into the State
hall, and went first to the actual possession of Mr. Gallien,
the Second Deputy Comptroller. Thus, it came into the
actual possession of a sub-servant of the State, whose actual
possession was the possession of the State, who thereby
became the special owner of it. If it was sent by a mes-
senger to Phelps, as the jury might have found that it was,
that messenger had actual possession of it. He was another
sub-servant of the State, which had already acquired a
special interest in it. Thus, the actual possession of the mes-
senger was the possession of the State. The State never
had, and never could have, the manual possession of it ; but
it could and did have a constructive possession, and the
delivery of the draft into the custody of the plaintiff in error
for a special purpose, was a delivery by the State to him for
that purpose. Thus, he had only the custody or charge of
the draft. (*The People* v. *Bennett, supra; U. S.* v. *Hutchin-
son,* 7 Penn. Law Jour., 365.) And if the taking of it by
him from the messenger was not a trespass, the carrying it
away, having only the bare custody of it, was ; and if that

carrying of it away was with felonious intent, as the jury have found that it was, it was larceny. The authorities are cited in the case in this court (43 N. Y., *supra*), and the phraseology of this discussion is taken almost bodily therefrom.

When the owner has parted with the custody only of the property, and not with the possession, and the servant converts the chattel to his own use, it is larceny, though he had no felonious intent when he received it into his custody (2 Russ. on Cr., 158); which rule was applied in *Comm.* v. *Hutchinson* (2 Parsons' Selected Cases, 384) ; *People* v. *Call* (1 Denio, 120.)

There are several other points upon the printed brief handed up for the plaintiff in error. Some of the views contained in them have been met in the foregoing discussion. As the points which chiefly attracted our attention, and seemed to have most weight, have been already treated at length, it will suffice to notice others briefly.

1st. The draft was a legal, operative instrument, when it reached the hand of Phelps. The original payee had indorsed it to Mr. Hopkins, as Comptroller. This gave him the right to transfer it by indorsement. He had continued Mr. Gallien in office as Second Deputy Comptroller, upon the original appointment of Mr. Comptroller Allen, and had sanctioned his indorsement over of this kind of drafts to the State Treasurer. The office of Second Deputy Comptroller was a lawful office, and Gallien a lawful incumbent of it (2 vol. Laws of 1866, p. 1608), and with power to perform any duty put upon him by the Comptroller (1 R. S., 117, § 7), and authorized to act in the capacity of the deputy. (See, also, Laws 1873, p. 1003 ; 1874, p. 500.) The question of whether the State would be bound, as if an indorser, by the indorsement of its officers, does not enter into this case. If the indorsements transferred 'the power to use the draft to obtain the money called for by it, that made it operative. In the hands of the State Treasurer there would have been that power, and it was his duty to use it to get the money

for the use of the State, or to re-indorse it for return to the county treasurer ; and there can be no question but that he could have been compelled to do the latter, had he declined to do the former.

2nd. We think that the testimony of the conversation with Phelps at Jersey city was properly received. Though it did not particularize this draft, it did show circumstances which might, by inference, include or refer to this. (*Weed* v. *People*, 56 N. Y., 628.)

3rd. The challenge to the juror Lamb was properly overruled. Though some of his answers, taken separately would perhaps have established a disqualification, yet the effect of all that he said was to show him a proper juror, under the late statutes. (1872, p. 1133; 1873, p. 681.)

4th. The distinction attempted to be made between the descriptions or names, "The State of New York," and "The People of the State of New York," that a different thing or body is indicated by the use of one rather than the other, cannot be sustained. There are instances when the latter cognomen must be used, as in the enacting clause of bills, though this is probably more for the sake of uniformity than as matter of materiality. But, in the absence of positive requirement, the one appellation as well as the other designates completely the thing meant, the sovereignty whose rights have been affected. The plaintiff in error cites many instances of constitutional and statutory expression where the phrase "The People of the State," or "The People of the State of New York," is preferred. There are others where the other designation is used. (2 R. S., 703, §§ 35–36; 1 id., 165, § 15; 65, § 3; 172, §§ 13–17; 179, 181, §§ 1–17.) The first citation of those just made, is of the statute which defines "*person*," as used to designate the party whose property may be the subject of any offense, and in it it is said that the terms shall include "*this State.*" Another statute indicates that all civil actions will be brought in the name of the People of this State. (2 R. S., 552, § 13.) Neither, in our judgment, was meant to declare a difference

in ultimate material signification from " the State of New York;" but only to prescribe a rule to save doubt. And the rule invoked by the plaintiff in error, that the ownership must be laid in some person or body who could maintain the civil action of trespass for the recovery of the property, must be considered in this case, in view of the operation of the above statute, which defines the word " person," and as modified thereby.

The numerous requests to charge have been considered. The propositions embodied in them, or most of them, have been expressly or inferentially discussed in what has already been said. As to the rest, we are of the opinion that no error was committed in the refusals, connected, as they were, in the utterances of the court, with the charge which was given to the jury.

The case was well tried at Oyer and Terminer, and has been ably and thoroughly presented to this court. The exhaustive briefs of the respective counsel, touching the case at all points, have very much assisted the labor of the court.

The consideration we have given it, has brought us to the conclusion that the plaintiff in error was legally indicted and convicted, and is justly undergoing the punishment for his unlawful act.

The case of the Oneida county draft is still stronger than the foregoing, from the additional fact that the written instrument in that case passed to Phelps from the hand of Milks, another servant of the State, and also a servant of the State Treasurer, and who held it for the State Treasurer, as well as for the State, before it was delivered into the custody of Phelps.

All concur.

Judgment affirmed.