UNITED STATES v. KAMBEITZ et al.

(District Court, N. D. New York. March 7, 1919.)

1. RAILROADS ☞5½, New, vol. 6A Key-No. Series—FEDERAL CONTROL—INTERFERENCE WITH OPERATION.

An employé, assisting in operating cars of an express company which has been taken over and is being operated by the government under Act March 21, 1918 (Comp. St. 1918, §§ 3115¾a–3115¾p), who steals express matter being carried by it for hire knowingly interferes with and impedes the "possession, use, operation, or control of * * * transportation system," which is made a criminal offense by section 11 of the act (section 3115¾k).

2. STATUTES ☞241(1)—CONSTRUCTION—PENAL STATUTES.

A penal statute is to be strictly construed, but not so narrowly as to defeat the purpose of its enactment.

3. RAILROADS ☞5½, New, vol. 6A Key-No. Series—FEDERAL CONTROL—LARCENY OF PROPERTY BEING TRANSPORTED—"DERIVED FROM."

Express matter being carried by an express company, while it is being operated by the government under Act March 21, 1918 (Comp. St. 1918, §§ 3115¾a–3115¾p), is "property derived from or used in connection with the possession, use, or operation of" the transportation system, and its larceny by employés constitutes a criminal offense against the United States, under section 11 of the act (section 3115¾k).

4. LARCENY ☞7—GOVERNMENT OWNERSHIP—EXPRESS MATTER—"PROPERTY OF THE UNITED STATES."

The United States has a special property in express matter being carried for hire by an express company operated by the government under Act March 21, 1918 (Comp. St. 1918, §§ 3115¾a–3115¾p), which will sustain a prosecution for larceny of such property under Criminal Code, § 47 (Comp. St. § 10214), making it an offense to steal any property or valuable thing whatever of the money or property of the United States.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Property of the United States.]

5. RAILROADS ☞5½, New, vol. 6A Key-No. Series — FEDERAL CONTROL — "TRANSPORTATION SYSTEM."

A "transportation system," within Act March 21, 1918, § 11 (Comp. St. 1918, § 3115¾k), making it a criminal offense to interfere with or impede the possession, use, operation, and control of the transportation system, is a system which transports something from one place to another.

6. RAILROADS ☞5½, New, vol. 6A Key-No. Series—FEDERAL CONTROL—"USE" OF TRANSPORTATION SYSTEM.

The "use" of the system, within Act March 21, 1918, § 11 (Comp. St. 1918, § 3115¾k), making it a criminal offense to interfere with or impede the possession, use, operation, and control of the transportation system, consists in taking up, carrying, and putting down property.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Use.]

7. RAILROADS ☞5½, New, vol. 6A Key-No. Series—FEDERAL CONTROL—"OPERATION" OF TRANSPORTATION SYSTEM.

The "operation" of the system, within Act March 21, 1918, § 11 (Comp. St. § 3115¾k), making it a criminal offense to interfere with or impede the possession, use, operation, and control of the transportation system, consists in running the cars and carrying therein property being moved from one point or place to another.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Operation.]

Criminal prosecution by the United States against Otto Kambeitz and another. On demurrer to indictment. Overruled.

The defendants demur to the indictment in this case, which charges them with a violation of section 11 of the Act of March 21, 1918 (40 Stat. 457, c. 25 [Comp. St. 1918, § 3115¾k]), known as the Railroad Control Act, and also with a violation of section 47 of the Criminal Code of the United States (Act March 4, 1909, c. 321, 35 Stat. 1097 [Comp. St. § 10214]), on the ground the indictment, which contains three counts, does not state facts constituting a crime or criminal offense under said sections of the laws referred to. The facts charged will be stated in the opinion.

D. B. Lucey, U. S. Atty., of Ogdensburg, N. Y., for the United States.

Philip J. Doherty, Counsel Property Protection, U. S. R. R. Administration, of Washington, D. C., amicus curiæ.

Lester W. Bloch, of Albany, N. Y., for defendants.

RAY, District Judge. The New York Central Railroad Company owns and operates a railroad line extending from the city of New York, N. Y., up the Hudson river valley to Albany, N. Y., and thence westerly up the Mohawk valley to Rome, N. Y., and thence on to Buffalo, N. Y. From thence on westerly by means of contracts and agreements and leases it operates its road and cars to Chicago and has connections across the continent. This railroad company is engaged in both interstate and intrastate and also in foreign commerce, as one of its lines runs into and through Lower Canada, via Suspension Bridge, to Detroit, Mich. The American Railway Express Company, Incorporated, is a transportation line and system operating on and over this line of railroad and its connections from New York City to San Francisco, and is engaged in transporting both interstate and intrastate commerce and also foreign commerce. It has suitable and effective contracts and leases for this purpose with the said railroad company. It is an independent transportation system, and carries for hire what is known as express matter, goods and chattels, some owned by itself, some by the railroad company, but mainly by the general public desiring to have its property carried by this transportation line and system to the different points reached by it. Goods and merchandise sent over this line and carried or transported by this transportation system may be consigned to Albany, Schenectady, Utica, Syracuse, Rochester, Buffalo, Cleveland, Detroit, Chicago, or to intermediate points, or to more distant points. If packages are stolen from the cars used in such transportation, it is many times difficult to ascertain the point to which consigned.

Prior to the times mentioned in this indictment against these defendants the President of the United States, by virtue of and pursuant to the act of Congress authorizing such action, took over, not only this railroad line and system, but this transportation line and system, and at the times mentioned was actually operating both of same for the carriage and transportation of passengers, freight, and express matter, both in interstate and intrastate commerce, and employed men

of all grades in so operating them. The indictment charges this, and charges that the defendants were two of such employés engaged at the time in operating and running, or in assisting to operate and run, certain cars as a part of such transportation system, containing certain express packages and matter, which were being conveyed and transported for hire from New York City to Syracuse, N. Y., or beyond, and that the United States, by virtue of such facts and of the liability and engagement to use reasonable care to supply, transport, and deliver, and the right to demand and receive compensation therefor, and claim and enforce a lien on such property for the charges, had a special property in such goods and merchandise so being transported. The indictment alleges that the said railroad and said transportation system were at the time engaged in the movement and transportation of both interstate and intrastate commerce, but does not charge that the goods stolen and hereafter mentioned were or constituted a part of an interstate shipment or package. The indictment then charges that at some point in the state of New York, between Albany and Syracuse, the exact point being unknown, and while such goods contained in one of such cars were being so transported, the defendants, said employés, on such train and engaged in operating and running such cars containing such goods, wrongfully and unlawfully broke and entered one of such cars and stole therefrom and carried away and appropriated to their own use certain express matter being so transported for hire, and consisting of a fur collar and a fur coat, and in one count the indictment charges that in so doing the defendants knowingly interfered with and impeded the possession, use, and operation of such transportation system, and in another count charges that the defendants in so doing took and converted to their own use property derived from and used in connection with the possession and use and operation of such transportation system.

The defendants contend, first, that the indictment is demurrable, in that it fails to charge that the goods so stolen and converted to their own use by the defendants were an interstate, or part of an interstate shipment or consignment, and, secondly, that such an act, the stealing and conversion by employés of goods so being carried for hire, does not constitute an interference with or an impeding of the possession or use or operation of the transportation system; and they also contend that such stealing and conversion of such property, so being transported for hire, is not the stealing or conversion of property derived from or used in connection with the possession, use, or operation of such transportation system.

It is contended such goods are not derived from the possession, or use, or operation of the system, and that they are not used in connection with the possession, or use, or operation of such transportation system. Lastly, it is contended that the United States has no interest or ownership in such goods so being transported, and that the stealing of same is not within section 47 of the Criminal Code of the United States.

[1] Each of these defendants was a "person" employed by the "carrier," the transportation line or system which was in the possession of

and being operated by the United States, through the President of the United States and the Director General of Railroads appointed by the President, all pursuant to law. The acts were "knowingly" done by such defendants. Did such acts "interfere with," or "impede the possession," or "impede the use," or "impede the operation," or "impede the control" of the "transportation system"? What is the "transportation system"? Does the system consist of a roadbed, railroad ties and rails, and engines and cars drawn thereby and moved from point to point on such rails, together with stations and offices at various points; or does the "transportation system" include such system when in operation, doing the things and effecting the objects it was created and established to do and bring about, viz. the transportation of goods and merchandise from point to point, and the movement of the property intrusted to it to be carried or transported in operating the system? Does it interfere with or impede the use, or the operation, or the control, or the possession of the transportation system to steal and carry away and convert to the use of the thief the property intrusted to and being carried by the one lawfully possessing and operating the system? Does the system "operate," and is it "used," when the cars move, whether or not it carries the goods and merchandise intrusted to it to be carried and transported thereby?

A "transportation system" is not organized or created to run empty cars or vehicles from place to place, but to transport or carry from place to place goods and merchandise. The system operates when it is engaged in doing this work, and it seems to me that he who unlawfully takes the goods contained in and being transported in and by such cars therefrom, and converts same to his own use and purposes, not only interferes with, but impedes, the possession, use, operation, and control of the system. The possession, use, and operation of the system includes the right to carry and transport the goods intrusted to the carrier without unlawful obstruction or interference, and he who unlawfully interferes with and impedes the exercise of this right interferes with and impedes such possession, use, and operation of the system itself. If the goods being transported by the operation of the system are unlawfully taken and carried away, the system ceases to operate. The instrumentalities used in operating the system may still move, but the "transportation system" does not operate.

[5] In Gloucester Ferry Co. v. Pennsylvania, 114 U. S. 196, 203, 5 Sup. Ct. 826, 828 (29 L. Ed. 158), the court said:

"Transportation implies the taking up of persons or property at some point and putting them down at another."

Therefore a "transportation system" implies the taking up of persons or property at some point and putting them down at another as a part of such system, as well as a part of the operation of the system. "Transportation" is carriage from one place to another. U. S. v. Hamburg American Line, 159 Fed. 104, 105, 86 C. C. A. 294. A transportation system, then, is a system which transports something from one place to another. The "use" of the system, or the "opera-

tion" of the system, consists in carrying persons, or property, or both, from place to place, and he who unlawfully takes the goods being carried in operating the system from the cars or vehicles which form a part of such system, not only interferes with the use, but with the operation and the possession, of the system.

[6, 7] Section 11 of the Act of March 21, 1918, provides:

"That every person * * * or person acting for or employed by a carrier, * * * or other person, who * * * shall knowingly interfere with or impede the possession, use, operation, or control of any railroad property, railroad, or transportation system hitherto or hereafter taken over by the President, * * * shall be guilty of a misdemeanor, and shall, upon conviction, be punished," etc.

It is noted that this part of the section makes it a misdemeanor for an employé to knowingly interfere with, or impede, either the possession, or the use, or the operation, or the control of the transportation system. If, then, either the use or the operation of the transportation system calls for the transportation—that is, the taking up of property at some point and putting it down at another—and the carrier who is operating the system is actually engaged in doing this, having the property in custody and moving it on the cars, how can it be claimed that an employé of the carrier engaged in operating such cars, who breaks and enters a car and steals and carries away and converts to his own use a part of such property so being carried, does not interfere with the possession of the system, or impede the possession, or both interfere with or impede the use and also the operation and the control of such transportation system? The use of the system consists in taking up, carrying, and putting down property, and the operation of the system consists in running the cars and carrying therein such property so being moved from one point or place to another.

[2] It seems too clear for argument that the employé who commits the act mentioned, not only interferes with the possession of the system by the carrier, but interferes with and impedes the use and operation of the transportation system. To come within this part of the section, must the employé or other person tear up a rail, or take a wheel from a car or the engine, or blockade the tracks, or blow up a bridge, or burn a trestle? Is this part of the section aimed at such acts as these alone, and not at the unlawful taking and carrying away of the property being transported by the carrier in operating the system? I think not. The purpose of Congress was to protect the possession, and the use, and the operation, and the control of the transportation system. This would not be done, should we give to this part of the section the narrow and restricted construction contended for by these defendants. It is a penal statute, and is to be strictly construed, but not so narrowly construed as to defeat the purpose of its enactment. United States v. Ash Sheep Co. (C. C. A.) 250 Fed. 592; Johnson v. Southern Pac. Co., 196 U. S. 18, 25 Sup. Ct. 158, 49 L. Ed. 363; United States v. Lacher, 134 U. S. 624, 10 Sup. Ct. 625, 33 L. Ed. 1080.

Circular No. 14, dated March 26, 1918, and signed by W. G. Mc-Adoo, Director General of Railroads, contains the following:

"Officers and employés must understand that all property being transported by the railroads is in the custody of the United States and they owe an especial duty to guard and protect the same and to report promptly any person who tampers therewith; and the United States looks to the officers and employés to do their duty in this behalf."

Obviously it was the purpose of Congress not only to protect the instrumentalities used in operating a transportation system, such as engines, cars, vehicles of any kind, and other equipment, but the goods and property carried in operating and using the system, and to protect the government in its possession, use, operation, and control thereof and from interference therewith. Strange indeed would it be, if the government should pile alongside the empty cars used in operating a transportation system a million dollars' worth of army and navy supplies ready to be placed in and on such cars for transportation to some designated point, to have it held that thieves, who happen to be employed by the government in loading same, cannot be punished under this act, when they steal, carry away, and convert to their own use and benefit such goods of the government, on the ground and theory that they, in so doing, did not interfere with, or impede the possession, use, operation, or control of, such transportation system. Such acts would not only interfere with and impede, but absolutely prevent, the "use" of the system for the time being, unless it be held that such acts would not offend against the act of Congress we are considering, inasmuch as the thieves did nothing to prevent the engineer and fireman from getting up steam and running the empty train to its destination.

Congress authorized the President to take over railroads, railroad systems, and transportation systems, and the President took them over, not for the mere purpose of running trains, and merely to operate the instrumentalities used in effectively possessing, using, operating, and controlling these transportation systems and railroad systems, but for the purpose of expediting and controlling commerce, and for the effective and expeditious transportation of goods, merchandise, and other property, as well as people, especially troops; and when Congress in this act spoke of the use and operation of a transportation system it intended the words to include the ordinary and effective use and operation of the system for the accomplishment of the ends for which such systems were established and taken over by the government. And I cannot doubt that Congress intended to include in this protection, not only every instrumentality belonging to and forming a part of the system permanently, but all property and persons being carried when the instrumentalities of the system are in operation. Let us suppose that a train load of troops was on its way from Buffalo to New York, for oversea service, and that a band of ruffians at Syracuse, with the train at a standstill, had thrown offensive or dangerous matter through the windows amongst the soldiers, driving them from the cars even temporarily; can it be said that such acts did not inter-

fere with the possession or use of the railroad or transportation system? I think there is a difference between a railroad system in operation, or a transportation system in operation, and such systems established, but not in operation. When put in motion to effect the object or purpose for which constructed or established, they are in use or operation. When the transportation system, consisting of roadbed, rails, cars, engines, and other apparatus, takes on merchandise or express matter for transportation, it is being operated and used, and to my mind any act which interferes with and prevents this merchandise or express matter from being carried as intended is an interference with, or an impeding of, the use, operation, and control of the system.

[3] Section 11 of the act of March 21, 1918, further provides:

"For the taking or conversion to his own use or the embezzlement of money or property derived from or used in connection with the possession, use, or operation of said railroads or transportation systems, the criminal statutes of the United States, as well as the criminal statutes of the various states where applicable, shall apply to all officers, agents and employés engaged in said railroad and transportation service, while the same is under federal control, to the same extent as to persons employed in the regular service of the United States."

It then provides:

"Prosecutions for violations of this act or of any order entered hereunder shall be in the District Courts of the United States, under the direction of the Attorney General in accordance with the procedure for the collection and imposing of fines and penalties now existing in said courts."

Section 47 of the Criminal or Penal Code of the United States provides as follows:

"Whoever shall embezzle, steal, or purloin any money, property, record, voucher, or valuable thing whatever, of the moneys, goods, chattels, records, or property of the United States, shall be fined not more than five thousand dollars, or imprisoned not more than five years, or both."

This makes it a crime to embezzle, or steal, or purloin any money or property or valuable thing whatever of the moneys, goods, chattels, or property of the United States.

This indictment charges in a separate count the taking over by the President pursuant to law of the railroad and transportation systems hereinbefore described, and that it was being run and operated by the United States through the Director General of Railroads, and that the defendants were employés engaged in running cars forming a part of such systems, which were carrying from New York City to Syracuse, or beyond, certain packages of express matter for hire, and that for reasons heretofore stated the United States had not only the possession of, but a special property in, such goods or packages. The indictment then charges that the defendants broke and entered one of such cars then being run and operated and carrying such goods and packages, and stole, took, and carried away and converted to their own use certain of such goods in which the United States had a special property, the property so taken being described and its value

stated. It is not charged that the United States was the sole owner of such goods, or that the goods stolen were interstate packages, but it is charged that the transportation systems and cars were then being operated by the United States in both interstate and intrastate commerce.

First. Did these defendants, in doing what they did do, take or convert to their own use "property derived from or used in connection with the possession, use, or operation of said transportation systems"?

Second. If so, was the property so stolen, taken, and converted to their own use by the defendants "of the goods, chattels, records or property of the United States"?

Was this property, then in the possession of the United States and so being transported by it, and which was so taken by the defendants, "property derived from" the "operation" of said transportation system? The operation of this transportation system consisted and consists in drawing or obtaining or receiving from others goods, chattels, or other property for transportation for a compensation, and the transportation of such property. This is the main thing the transportation system does when in operation. It does not operate unless it does this, and only operates when it does this. Hence this property and its possession was derived from the operation of this transportation system. "Derive" means (see Century Dictionary):

"(3) To draw or receive, as from a source or origin, or by regular transmission; as to derive ideas from the senses; to derive instruction from a book; his estate is derived from his ancestors."

Clearly the property stolen by defendants was derived from the operation of the transportation system; that is, by means of and because of the operation and use of the system. It was by operating this transportation system that the United States obtained and came into possession of such property. But for such operation of the system the United States would not have had it. So this property so stolen was derived from the possession and use of such transportation system. In operating such a transportation system the one in possession and operating it holds himself or itself out as a common carrier for hire and invites custom—the delivery to it of property for transportation. This is a necessary part of the use and operation of the system of transportation. The words "derived from" do not imply that the property stolen or converted by the employé must have been purchased with money earned in carrying on or operating or using the system, or that such property must be a part of that which came to the possession of the government when the transportation system was taken over.

Assume a deficiency in earnings to carry on, use, and operate the transportation system, and an appropriation by Congress to continue its operation and use. Assume that a part of such appropriation is placed in the hands of a disbursing officer of the transportation company for the payment of employés or the purchase of necessary supplies for operating such system of transportation. Assume that an

officer, agent, or employé engaged in such transportation service takes such money or a part of it and converts it to his own use. May or may not such officer, agent or employé be punished under the provisions of this act of Congress for such stealing, conversion, and embezzlement? It seems to me clear that the moment such money is paid over for use in carrying on, using, and operating the transportation system it becomes money and property derived from the possession, use, and operation of such transportation system. It is money drawn and received from the public treasury for use in connection with the possession and use and operation of the transportation system. It seems to me it would be a very refined construction to say that such money is not "money or property derived from or used in connection with the possession, use, or operation of said railroads or transportation system," for the reason it was not actually earned by the United States in operating the system. This would be adopting a narrow construction, for the purpose of defeating the operation of the statute, instead of a sensible and natural one, which would make it operative and effective.

When the government has taken over the transportation system, and is engaged in using and operating it, the money being used and set apart to be used, and the money earned in such use and operation, together with all property delivered to the government to be transported in using and operating the system, becomes "property derived from or used in connection with the possession, use or operation of said railroads or transportation systems," and the officer or agent or employé who steals or converts to his own use such money or property, or any of it, comes under the provisions of the act and may be punished accordingly. For the purposes of the act the United States is made not only the custodian, but the owner, of the property so coming into its possession for transportation. "The criminal statutes of the United States * * * shall apply to all officers, agents and employés engaged in said railroad and transportation service, while the same is under federal control, to the same extent as to persons employed in the regular service of the United States." This, to all intents and purposes, makes such persons employés in the regular service of the United States, so far as "the taking or conversion to his own use or the embezzlement of money or property derived from or used in connection with the possession, use, or operation of said railroads or transportation systems" is concerned.

[4] Is such property so received and so being transported by the United States for hire "property" or "valuable thing whatever of the * * * goods, chattels, * * * property of the United States"? How far and to what extent must the United States be the owner of such property? This indictment charges that the United States had a special property in the goods so being transported, and so stolen and converted by the defendants, and states the nature of such ownership.

In Dimmick v. United States, 135 Fed. 257, 70 C. C. A. 141, it was held, under what is now section 47 of the Criminal Code of the United States, that an averment in the indictment that the stolen money "be-

longed" to the United States was sufficient. It is of course necessary that the property stolen shall be "property or valuable thing whatever of the goods, chattels or property of the United States"; but I do not think it necessary to allege or prove on the trial that the United States was the sole and exclusive owner of the entire property in the thing. If the United States has the actual rightful possession of, and is the owner of a special property in, the thing of value stolen, it is all-sufficient. To steal property from the custody and possession of the United States, in which the United States has and owns a special property, is to steal property of the United States. Section 47 of the Criminal Code, above quoted, does not say that the United States must be the sole and exclusive owner of the entire property in the thing stolen.

"To sustain an indictment for larceny, the goods alleged to have been stolen must be proved to be the absolute or special property of the alleged owner, who cannot be the defendant." Wharton on Criminal Law, § 1818; Commonwealth v. Morse, 14 Mass. 217, 218; Commonwealth v. Manley, 12 Pick. (Mass.) 173, 174; Jones v. Commonwealth, 17 Grat. (Va.) 563; State v. Furlong, 19 Me. 225.

"The proper practice is to insert counts charging the ownership in as many ways as there are parties interested; but, as a general rule, it will be sufficient if either general or special ownership be alleged. Hence, when bailed goods are stolen by a stranger, the ownership may be laid either in bailor or bailee." Wharton on Criminal Law, § 1918; R. v. Vincent, 2 Den. C. C. 464; R. v. Bird, 9 C. & P. 44.

When goods are intrusted to a carrier to carry, such carrier while in possession has a special property in such goods, and the property ownership may be laid in the carrier. People v. Smith, 1 Parker, Cr. R. (N. Y.) 329. Says Wharton, § 1824:

"Whenever a person has a special property in a thing, or holds it in trust for another, the property may be laid in either."

See State v. Somerville, 21 Me. 14; State v. Grant, 22 Me. 171; R. v. Remnant, R. & R. 136, 4 C. & P. 391; Langford v. State, 8 Tex. 115; Huling v. State, 17 Ohio St. 583; People v. Bennett, 37 N. Y. 117, 93 Am. Dec. 551; Commonwealth v. O'Hara, 10 Gray (Mass.) 469; State v. Mullen, 30 Iowa, 203; Commonwealth v. McLaughlin, 103 Mass. 435; Yates v. State, 10 Yerg. (Tenn.) 549.

In Yates v. State, supra, the indictment alleged the watch stolen to be that of A. On the trial it appeared that B. owned the watch, but that he had exchanged it with A. for a few weeks, and that it was stolen from the possession of A. It was held that A. had a special property in the watch sufficient to sustain the indictment. One who has the property in goods may be guilty of larceny in stealing them from one to whom he has given them in custody in special possession, thereby conferring a special property. See Palmer v. People, 10 Wend. 165, 25 Am. Dec. 551; State v. Dewitt, 32 Mo. 571. In Pierson v. State, 78 Tex. Cr. R. 275, 180 S. W. 1080, and Tyler v. State, 78 Tex. Cr. R. 279, 180 S. W. 687, in a prosecution for larceny from a freight car in local railroad yards, it was held that ownership

of freight was properly alleged in the local freight agent in the one case and in the station agent in the other case; it being shown that such officials had charge and control of such yards.

In this case the indictment alleges that the United States had and has a special property in the goods stolen, and that the government had the possession of the goods, and that the property was stolen and taken from that possession. In People v. Bennett, 37 N. Y. 117, 93 Am. Dec. 551, the court held:

"Property purchased for the support of the poor by the direction of the superintendent of the county, and kept for that purpose, if stolen, may be laid in the indictment either as the property of the county or of the superintendent.

"The office of superintendent of the poor, though invested with corporate powers, is, notwithstanding, a mere agency of the county, and the relation between the county and its superintendnt is that of principal and agent."

In the opinion the court said:

"It is undeniable that in an indictment for larceny it is essential that the pleader should aver title or ownership in the property stolen to be in the true owner, if known, and, if not known, then it should be averred that the owner was to the jurors unknown. This is a general rule in criminal pleading, and, in applying it, it has been held, that the owner was one who had a general or special property in the thing taken. * * *

"The cases abundantly sustain the position that an averment of ownership in the person having the actual possession and control of the thing stolen at the time of the theft is all that is required."

In Phelps v. People, 72 N. Y. 334, 357, the court held:

"It is not necessary that an indictment for larceny should name as owner one who has the general ownership; it is sufficient if one be named who has a special property in the property stolen.

"So a bailee of property may be named as owner, and this as well where the character of bailee arose from the fact that the thing came into his actual possession and control fortuitously or by mistake, as where it was created by express agreement."

In the opinion, Folger, J., said:

"Nor is it necessary that it be held that the state acquired an absolute property in the draft. Whatever right its public agents acquired in it, they acquired for it. If that was a special and limited interest in it, still it was such an interest as that it made a proper averment to allege that the state was the owner.

"It is not necessary that the indictment should name that person as owner, and him only, who has the general ownership of the property, a title absolute, which he can maintain against the whole world. It is enough, if any one be named who has a special property in the thing stolen. A special property is a qualified or limited right, such as a bailee of it has; and a bailee of property is one to whom the thing has been delivered, to be held according to the purpose or object of the delivery, and to be returned to the bailor, or delivered over to some other, when that object has been accomplished, or for the purpose of accomplishing it; and the obligation of the bailee may arise by implied contract, as well as express agreement."

It is undeniable that the United States, pursuant to act of Congress, has taken over this New York Central Railroad and railroad system, and also this transportation system, the American Railway Express

Company, and that the government is, and at the time of the commission of the acts constituting the alleged offense was, actually in possession and using and operating them for the transportation of persons and property for its own purposes and also for hire. This had been done through or by act of the President of the United States duly authorized thereto, who, by like authority, put same in the actual custody of Wm. G. McAdoo, who was named Director General of Railroads. Neither the United States, nor the President, nor the Director General, is doing this as agent for the railroads or the transportation companies. The United States, through its officers and agents, is doing all this on its own account, and to accomplish its own purposes, including service to and for the general public. The United States is not in partnership with these transportation or railroad systems. The earnings for the time being, and until such time as these properties are turned back to the possession and control of the corporations owning them, belong to the United States. He who steals such earnings steals the money of the United States. The property received by those in charge of these transportation systems for transportation is received by the United States, to be transported by the United States, and is in the custody and under the protection of the United States as bailee and carrier, and the United States has a property therein. Congress had power to enact laws for the protection of this possession, use, and operation and of all property coming into its possession in operating the systems, and it was not so short-sighted as to enact a statute for the protection of the mere operation of the instrumentalities forming the physical part of the systems and such instrumentalities, leaving the United States powerless, except as it might resort to local state courts, to protect the millions of dollars' worth of merchandise in the custody of the United States as bailee and carrier, and being transported by it, against the depredations of robbers and thieves. As was said by Judge Booth in Dooley v. Pennsylvania Railroad Co. (D. C.) 250 Fed. 142:

"In the statute above quoted, the President was authorized to 'take possession, assume control and utilize any system of transportation.' It needs no argument to show that it was necessary, in order that these powers be made effective, that the possession, the control, and the utilization of the property should be exclusive, and not subject to interference by private parties."

It is unnecessary to enter into a discussion of the exact relations existing between these transportation companies and the government of the United States, or into a minute statement of the obligations owing by the one to the other. Under the decisions, as we have seen, it is all-sufficient that the United States is in the lawful possession and control of these transportation systems and of the property belonging thereto, and is operating same, and that in so operating them the United States invites and receives into its possession shipments of freight, express matter, goods, and chattels, which as a common carrier and bailee it undertakes to carry and deliver, and that the United States, in such capacity and occupying such relations, has a special property in such goods. It is entirely immaterial whether or not the

goods in question in this case and stolen by the defendants constituted in whole or in part an interstate shipment. The power of the United States to take over, control, and operate these railroad and transportation systems carries with it as incident thereto the power to protect and preserve them in every part, and also to protect and preserve all property lawfully received into its custody in so operating same. The United States may protect its property, and all property in its possession and under its control in which it has a property interest, anywhere and everywhere within the limits of the United States.

In this case the railroad bed, right of way, tracks, engines, cars, appliances, and stations, with power houses, etc., are all in the possession and under the exclusive control of the United States, and subject to its jurisdiction. It is true that we must find some statute denouncing it as a criminal offense to intermeddle with the possession and control and operation of these systems and of the property carried thereby, while under government control, before such acts can be punished by the federal courts as crimes. In the United States courts we have no common-law crimes, but Congress has undertaken to cover this whole subject by the act of March 21, 1918, and in my judgment has done so effectively. The proclamation of the President, taking over the transportation systems, declared:

"And whereas, it is provided by section 1 of the act approved August 29, 1916, entitled 'An act making appropriations for the support of the army for the fiscal year ending June 30, 1917, and for other purposes,' as follows: "The President in time of war is empowered, through the Secretary of War, to take possession and assume control of any system or systems of transportation, or any part thereof, and to utilize the same, to the exclusion, as far as may be necessary, of all other traffic thereon, for the transfer or transportation of troops, war material, and equipment, or for such other purposes connected with the emergency as may be needful or desirable.'

"And whereas, it has now become necessary in the national defense to take possession and assume control of certain systems of transportation and to utilize the same, to the exclusion, as far as may be necessary, of other than war traffic thereon, for the transportation of troops, war material, and equipment therefor, and for other needful and desirable purposes connected with the prosecution of the war:

"Now, therefore, I, Woodrow Wilson, President of the United States, under and by virtue of the powers vested in me by the foregoing resolutions and statute, and by virtue of all other powers thereto me enabling, do hereby, through Newton D. Baker, Secretary of War, take possession and assume control at 12 o'clock noon on the 28th day of December, 1917, of each and every system of transportation and the appurtenances thereof located wholly or in part within the boundaries of the continental United States and consisting of railroads and owned or controlled systems of coastwise and inland transportation engaged in general transportation, whether operated by steam or by electric power, including also terminals, terminal companies, and terminal associations, sleeping and parlor cars, private cars and private car lines, elevators, warehouses, telegraph and telephone lines, and all other equipment and appurtenances commonly used upon or operated as a part of such rail or combined rail and water systems of transportation, to the end that such systems of transportation be utilized for the transfer and transportation of troops, war material, and equipment, to the exclusion so far as may be necessary of all other traffic thereon, and that so far as such exclusive use be not necessary or desirable such systems of transportation be operated and utilized in the performance of such other services as the national interest may require and of the usual and ordinary business and duties of common carriers."

General Order No. 1 declared:

"3. All transportation systems covered by said proclamation and order shall be operated as a national system of transportation, the common and national needs being in all instances held paramount to any actual 'or supposed corporate advantage. All terminals, ports, locomotives, rolling stock, and other transportation facilities are to be fully utilized to carry out this purpose without regard to ownership.

"4. The designation of routes by shippers is to be disregarded when speed and efficiency of transportation service may thus be promoted.

"5. Traffic agreements between carriers must not be permitted to interfere with expeditious movements."

I am well aware of the decision of the Supreme Court that there can be no constructive offenses, and the court cannot extend or broaden a criminal statute, for the reason it thinks Congress should have made it broader and more comprehensive. United States v. Bathgate, 246 U. S. 220, 38 Sup. Ct. 269, 62 L. Ed. 676; United States v. Weitzel, 246 U. S. 533, 543, 38 Sup. Ct. 381, 62 L. Ed. 872; Todd v. United States, 158 U. S. 278, 282, 15 Sup. Ct. 889, 39 L. Ed. 982; United States v. Harris, 177 U. S. 305, 20 Sup. Ct. 609, 44 L. Ed. 780.

However, when the acts done and complained of are malum in se, criminal in their nature, and plainly within the words of an existing applicable statute, giving them their ordinary meaning, and clearly within the spirit and intent of the statute, the court should not seek for and adopt a possible and narrow construction, which will permit the commission of lawless and immoral acts, destructive of property rights and detrimental to the public interests.

In United States v. Corbett, 215 U. S. 233, 242, 243, 30 Sup. Ct. 81, 84 (54 L. Ed. 173), the court held:

"The rule of strict construction of penal statutes does not require a narrow, technical meaning to be given to words, in disregard of their context, and so as to frustrate the obvious legislative intent."

In the opinion the court said:

"But the argument is that, however cogent may be the considerations just stated, they are here inapplicable, because the statute is a criminal one, requiring to be strictly construed. The principle is elementary, but the application here sought to be made is a mistaken one. The rule of strict construction does not require that the narrowest technical meaning be given to the words employed in a criminal statute, in disregard of their context and in frustration of the obvious legislative intent. United States v. Hartwell, 6 Wall. 385 [18 L. Ed. 830]. In that case, answering the contention that penal laws are to be construed strictly, the court said (page 395):

" 'The object in construing penal as well as other statutes is to ascertain the legislative intent. * * * The words must not be narrowed to the exclusion of what the Legislature intended to embrace; but that intention must be gathered from the words, and they must be such as to leave no room for a reasonable doubt upon the subject. * * * The rule of strict construction is not violated by permitting the words of the statute to have their full meaning, or the more extended of two meanings, as the wider popular, instead of the more narrow technical, one; but the words should be taken in such a sense, bent neither one way nor the other, as will best manifest the legislative intent.'

"It is to be observed that the rule thus stated affords no ground for extending a penal statute beyond its plain meaning. But it inculcates that a

meaning which is within the text and within its clear intent is not to be departed from because, by resorting to a narrow and technical interpretation of particular words, the plain meaning may be distorted and the obvious purpose of the law be frustrated. Bolles v. Outing Co., 175 U. S. 262, 265 [20 Sup. Ct. 94, 44 L. Ed. 156], and especially United States v. Union Supply Company, decided this term [215 U. S.] 50 [30 Sup. Ct. 15, 54 L. Ed. 87]."

In United States v. Union Supply Co., 215 U. S. 50, 30 Sup. Ct. 15, 54 L. Ed. 87, it was held:

"Where corporations are as much within the mischief aimed at by a penal statute and as capable of willful breaches of the law as individuals, the statute will not, if it can be reasonably interpreted as including corporations, be interpreted as excluding them."

The demurrer to the indictment is overruled.

Since writing the above, the defendants have been put on trial and convicted. The proof on the trial sustained every allegation of fact stated in the indictment and in the above opinion, and the above may be regarded as giving my reasons for refusing to set aside the verdict of the jury.