UNITED STATES of America,
Plaintiff,

v.

Hayward Leslie BROWN, Defendant.

Crim. No. 74–81692.

United States District Court,
E. D. Michigan, S. D.

Nov. 5, 1974.

Ralph B. Guy, U. S. Atty., Gordon S. Gold, Asst. U. S. Atty., Detroit, Mich., for plaintiff.

Sheldon Halpern and Kenneth Mogill, Detroit, Mich., for defendant.

## OPINION AND ORDER DENYING DEFENDANT'S MOTION TO DISMISS COUNT II OF THE INDICTMENT

KENNEDY, District Judge.

Defendant has moved to dismiss Count II of the indictment against him which charges him with the bombing of the Planned Parenthood Clinic, located at 3750 Woodward Avenue, Detroit, Michigan, on January 12, 1973, in violation of Title 18, United States Code, Section 844(f). That section provides:

> Whoever maliciously damages or destroys, or attempts to destroy, by means of an explosive, any building, vehicle, or other personal or real property in whole or in part owned, possessed or used by, or leased to, the United States, any department or agency thereof, or any institution or organization receiving Federal financial assistance shall be [guilty of an offense against the United States].

The indictment alleges that the Planned Parenthood Clinic is an institution receiving federal financial assistance. Defendant asserts that Planned Parenthood Clinic does not receive federal financial assistance since it receives no funds directly from any agency of the United States and, that if the funds which it receives amount to federal financial assistance within the meaning of the statutory language, Section 844(f) is unconstitutional because Congress lacks the power to enact such a law.

In support of his motion, defendant offered the testimony of Seymour Brieloff, the Executive Director of Southeastern Michigan Family Planning Project (SEMFPP). Mr. Brieloff formerly was an Administrative Coordinator of Planned Parenthood League, which operates the Planned Parenthood Clinic. Mr. Brieloff testified that prior to May

7, 1972, Planned Parenthood League received grants of monies directly from the Department of Health, Education and Welfare (HEW) for certain items of a line budget submitted by Planned Parenthood League. SEMFPP, a non-profit corporation, was created and began functioning in May of 1972. All of its operating funds come from HEW and it operates in accordance with HEW directives. Its function is to act as a funding and coordinating agency. Line-item budgets of approximately fifteen family-planning agencies (including Planned Parenthood League, as well as other charitable and public agencies in this area of Michigan) are submitted by SEMFPP to HEW for HEW's approval and funding. SEMFPP then receives a single check each month from HEW and disburses the budgeted sums to the various family-planning agencies based on the budgets which HEW has approved and the agencies' actual expenditures. SEMFPP acts, then as a disbursing agent and coordinator and also checks to see that HEW guidelines are being followed. In addition, SEMPFF makes bulk purchases with HEW funds (*e.g.*, supplies for the family-planning agencies which it can purchase cheaper), and distributes these items directly to the family-planning agencies or clinics. All SEMFPP funds and all funds disbursed by it come entirely from HEW and are disbursed in accordance with the line-item budgets approved in advance by HEW: SEMFPP has no discretion in how the funds are to be spent.

1. The funds paid to the Planned Parenthood League by HEW are authorized by the Family Planning Service Act, 42 U.S.C. § 300 et seq. (1970). That Act's legislative history indicates that Congress had as a goal the provision of adequate family-planning services for those who needed but could not afford them. 1970 U.S.Code Cong. & Admin. News p. 5073. Several programs are set up by the Act: *e. g.*, research and training grants, grants to the states, and project grants. It is under the last program (Section 1001 of the Act) that the grant to Planned Parenthood League was awarded. The House Report on the Act notes:

It is undisputed that approximately one-third of Planned Parenthood League's funds came from the federal government.[1] The remaining two-thirds came from private gifts or from fees paid by patients who can afford the charges. The federal funds received by Planned Parenthood are in two categories. Some are for specific services rendered to identifiable individuals. For example, Planned Parenthood League received $75.00 for each vasectomy performed and $200.00 per couple for fertility tests where the patient's income was within certain HEW guidelines. These amounts were based on actual cost to the clinic. The balance of the funds were for general expenditures, telephones, furniture, salaries, et cetera, and are not allocated to particular recipients of services.

Defendant's first challenge to Count II is that because these funds from HEW are channeled through SEMFPP for actual disbursement, funds which might otherwise constitute federal financial assistance lose this characteristic. In the Court's opinion, the assistance is no less federal because it is channeled through SEMFPP. SEMFPP acted only as a paying agent, for disbursing monies on a line-item budget without any power to determine how, when, or to whom they will be paid except to assure that HEW requirements were met. HEW itself made direct periodic inspections of SEMFPP's disbursements and also of Planned Parenthood League and other organizations and in-

Section 1001 authorizes the Secretary to make grants and to enter into contract with public or private nonprofit entities to assist in the establishment and operation of voluntary family planning projects. In making grants and contracts under this section, the Secretary is to take into account the number of patients to be served, the extent to which family planning services are needed locally, the relative need of the applicant, and its capacity to make rapid and effective use of such assistance. [1970 U.S.Code Cong. & Admin.News at pp. 5076–5077].

stitutions receiving funds in order to monitor the program. Thus, SEMFPP acts as a mere conduit for funds, much as a bank or escrow agent might act.

Defendant next contends that the amount of federal monies expended here is insufficient to warrant federal protection. The criminal statute which imposes criminal sanctions here, Title 18, United States Code, Section 844(f), is part of the Explosive Control Act of 1970, enacted as Title XI of the Crime Control Act of 1970 (PL 91–452). Title XI was not part of the original Crime Control Act but was added as an amendment by the House Committee on the Judiciary (H.R. 17154, H.R. 16699, H.R. 18573, and related proposals). The specific provision concerning the destruction by explosives of property belonging to institutions or organizations receiving federal financial assistance was not drafted into the House bills as initially reported but was added during the final debate on the Crime Control Act. *See* 116 Cong.Record 35196 (1970).

The House Report on the Crime Control Act, 1970 U.S.Code Cong. & Admin. News p. 4007 (hereinafter *House Report*) indicates that Congress intended that the term "Federal financial assistance" be given a broad meaning. The *House Report* states:

This section [§ 844(f)] also protects real and personal property belonging to institutions and organizations receiving Federal financial assistance such as universities, hospitals, and police stations. These provisions are designed to enable the Federal Government to participate more directly in the investigation and prosecution of such offenses. [*House Report, supra,* at p. 4014].

And, again:

[t]o permit the Federal government to more directly participate in the investigation and prosecution of the recent rash of attacks on ROTC facilities *and other buildings* on college campuses culminating in the tragedy at the University of Wisconsin, sec-

tion 844(f) also encompasses real and personal property belonging to institutions and organizations receiving Federal financial assistance. [*House Report, supra,* at p. 4046]. [Emphasis added].

The University of Wisconsin incident alluded to was the August 1970 bombing of the Army Mathematics Research Center at the University of Wisconsin, which resulted in $6 million in property damage. *See* letter to Representative Celler appended to Hearings Before Sub-committee No. 5, House Committee on the Judiciary, 91st Congress, second session, serial No. 29, at 324 (hereinafter *Hearings*). Although this incident is mentioned throughout the legislative history of the Explosives Control Act, the nature of the federal assistance to the bombed structure is not elaborated upon. Neither the *Hearings* nor the *House Report* states precisely what type of federal financial assistance is required to bring Section 844(f) into play. The phrase "other buildings on college campuses" supports the conclusion, however, that Congress intended Section 844(f) to cover the bombing of any building that is used for programs sponsored in whole or in part by the federal government—whether or not the federal government had a proprietary interest in the building itself.

This construction is buttressed by statements made on House Resolution 1235—the final version of the Crime Control Act. Representative McCulloch indicated that Section 844(f) was to be broadly interpreted so as to cover property where the federal government has no proprietary interest:

[i]t [Title XI] also writes new federal penalties for the use of explosive and incendiary devices to destroy property used in interstate commerce and property under the ownership or control of the Federal Government *including the property of institutions and organizations receiving Federal assistance.* 116 *Cong.Record, supra* at 35201 (1970). [Emphasis added].

Representative McCulloch further stated:

[i]n addition to tightening an earlier Federal anti-bombing law, Title XI extends federal jurisdiction to bombings on campuses receiving Federal financial assistance . . . . [*Id.* at ·35200].

 Neither in the *Hearings* nor in the *House Report* is there any indication that Congress intended any limitation on the scope of Section 844(f). It is intended to cover the bombings of any real or personal property of any institution receiving federal financial assistance in whatever capacity, for whatever purpose, and in whatever amount. In light of the legislative history of Section 844(f) and the clear, unambiguous language of the statute itself it cannot be said that Congress did not intend the bombing of the Planned Parenthood League main office to fall within the purview of Section 844(f)[2]

The most substantial issue raised by the defendant is that there is no constitutional authority for Congress to enact a statute making it a crime to damage or destroy personal or real property owned by "any institution or organization receiving Federal financial assistance . . . ". This broadside attack rests ultimately on the belief that power of the Federal Government is limited to specific constitutional grants of authority. Chief Justice Marshall said in 1819: "[t]he government is acknowledged by all to be one of enumerated powers. The principle, that it can exercise only the powers granted to it is now universally admitted. McCulloch v. Maryland, 17 U.S. (4 Wheat.) 316, 405, 4 L.Ed. 579 (1819)

Section 844(f) is specifically mandated under the Property Clause of the Constitution. Although the preamble to Title XI of the Crime Control Act states that the congressional purpose of the Act is to protect interstate commerce,[3] the *House Report* makes clear that Section 844(f) relies on the Property Clause for its constitutional basis:

Section 844(f) unlike the previous two subsections, is new, and relies for its constitutional base on the power of the Federal Government to protect its own property. See, e.g., 18 U.S.C. 641 (theft of Government property); 18 U.S.C. 1361 (willful destruction of Government property. [1970 U.S. Code Cong. & Admin.News at p. 4046].

The Property Clause reads in pertinent part:

The Congress shall have power to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States; . . . . [Article 4, Section 3, Clause 2].

 The reason for the grant of authority in the Property Clause was the obvious necessity of making provisions for the government control and disposition of the vast territory acquired by the United States. The power to govern and to dispose of that territory was deemed to be indispensible to the purposes of the cessions made by the States. The grant was made in broad terms, and the power of regulation and disposition was not confined to territory, but extended to "other property belonging to the United States," so that the power may be applied, as Story says, "to the due regulation of all other personal and

2. The Court need not face the question of whether an organization which receives funds only as reimbursements for services to particular and identifiable clients receives financial assistance within the meaning of § 844(f). The recipient, here, in addition to receiving reimbursement funds for client services, received funds for its own operational expenses, thus becoming a direct beneficiary of federal funds.

3. The Congress hereby declares that the purpose of the Title is to protect interstate and foreign commerce against interference and interruption oy reducing the hazards to persons and property arising from the misuse and unsafe or insecure storage of explosive materials. [1970 U.S.Code Cong. & Admin. News 1073, 1109].

real property rightfully belonging to the United States." Story on the Constitution, §§ 1325, 1326. And so, he adds, "it has been constantly understood and acted upon." *Id.*[4]

Early cases construing the Property Clause were concerned with the power of the federal government to acquire and govern territories of the United States: Sere v. Pitot, 10 U.S. (6 Cr.) 332, 3 L. Ed. 240 (1810) (Congress has absolute power of governing and legislating for the Territory of Orleans).; American Insurance Co. v. Canter, 26 U.S. (1 Pet.) 511, 7 L.Ed.2d 242 (1828) (power to govern the Territory of Florida may result from fact that it is not within the jurisdiction of any state or it may be inevitable consequence of the right to acquire territory); United States v. Gratiot, 39 U.S. (14 Pet.) 526, 10 L.Ed. 573 (1840) ("territory" as used in Property Clause is equivalent to word "land"; Congress has same power over territories as any other property belonging to United States); Cross v. Harrison, 57 U.S. (16 How.) 164, 14 L.Ed.2d 889 (1853) (Congress has power to govern acquisition of Mexico).

Other cases have broadly construed congressional power to dispose of real property owned by the United States; United States v. Gratiot, *supra* (Congress can lease federal property); Morton v. Nebraska, 88 U.S. (21 Wall.) 660, 22 L.Ed. 639 (1874) (Congress can reserve salt springs from the sale of federal lands); Ashwander v. Tennessee Valley Authority, 297 U.S. 288, 56 S.Ct. 466, 80 L.Ed. 688 (1936) (Congress can sell electricity from federal dam projects); Alabama v. Texas, 347 U.S. 272, 74 S.Ct. 481, 98 L.Ed. 689 (1954) (Congress can cede resources under the marginal sea to the States).

The government places much reliance on one of the cases in this line, Ruddy v. Rossi, 248 U.S. 104, 39 S.Ct. 46, 63 L. Ed. 148 (1918), a case which broadly construes Congressional power to dispose of federal lands. In *Ruddy,* the Court upheld an Act of Congress restricting alienation of homestead lands after conveyance by the United States in fee simple. Justice McReynolds reasoned that, since Congress could have granted a long-term lease on the property, thereby protecting homesteaders, it is within congressional discretion to effectuate the same policy through a different mode of disposal. *See also* United States v. San Francisco, 310 U.S. 16, 60 S.Ct. 749, 84 L.Ed. 1050 (1939).

*Ruddy* cannot be extended, however, to support the proposition that when government funds are granted to a private institution the government can control a third party's actions toward that institution under its power to dispose of federal property. The restrictions sanctioned in *Ruddy* were imposed on the sale of *federal lands* to a private individual. If this rationale were extended by equating federal funds in the hands of recipients with the "federal property" of Article 4, the breadth of that clause would be almost limitless and well beyond the framers' intent. Federal funding of any private program, irrespective of mode or extent, or federal funds disbursed to any individual for any purpose, could then be the basis of federal criminal sanctions on the theory that the federal government can protect its "property"—financial aid—after distribution to the recipient institutions or individuals.

Such a broad interpretation of the Property Clause was laid to rest five years after *Ruddy* in United States v.

4. While Story may be correct in that the clause has been judicially applied to personal property of the federal government, *see, e. g.,* United States v. Walter, 263 U.S. 15, 44 S.Ct. 10, 68 L.Ed. 137 (1923); Tennessee Valley Authority v. Lenoir City, 72 F.Supp. 457 (E.D.Tenn.1947), the framers of the Constitution were concerned only with territorial lands. Madison's notes make this clear. *See* Madison's diary of the Convention and details in Convention of August 30, September 12, and September 17, as set forth in Prescott, Arthur Taylor, Drafting the Federal Constitution (Lawrence, Kansas, 1941).

Walter, 263 U.S. 15, 44 S.Ct. 10, 68 L. Ed. 137 (1923). Justice Holmes narrowed the scope of a federal criminal statute which made it a crime to conspire to present for, or to obtain, payment of a fraudulent claim against "any corporation in which the United States of America is a stockholder." 263 U.S. at 17, 44 S.Ct. at 11. After citing several cases that limited generally-phrased statutes to make them constitutional, the Court held that the statute in question "should be construed to refer only to corporations like the Fleet Corporation that are instrumentalities of the government and which for that reason it owns stock." *Id.* at 18, 44 S.Ct. at 11.[5] The requirement that the defrauded corporation be an instrumentality of the government focuses on the instrumentality as the protectable federal property, not the disbursed federal funds. Holmes' opinion in *Walter* strongly suggests that a federal nexus of financial funding or even part ownership is a constitutionally insufficient basis for legislation mandated under the Property Clause.

Decisions of lower federal courts that have construed destruction-of-federal-property statutes (now 18 U.S.C. § 641 (1970) ) substantiate this position. In Fowler v. United States, 273 F. 15 (9th Cir. 1921), defendants challenged their conviction for stealing personal property from railroad cars in possession of the United States, arguing that the stolen property was not owned by the United States. The Court focused on the proprietary interest that the federal government did have:

> We think it a sufficient answer to this contention to say that the federal government was at the time in the actual control and management of the railroads of the country in pursuance of law, and was acting in that capacity as a bailee for hire. As such common carrier, it had a *special property* in the goods, chattels, and merchandise carried, and by virtue of such

ownership it was entitled to maintain as against third parties an action for damages to the property or to recover possession thereof, if wrongfully taken from it. [273 F. at 17] [Emphasis added].

In United States v. Kambeitz, 256 F. 247 (N.D.N.Y.1919), defendants were charged with stealing express material from a railroad car being operated by the federal government pursuant to the War Power. On defendants' challenge that the stolen goods were not property of the United States, the district court noted:

> [t]he United States may protect its property, and all property in its possession and under its control in *which it had a property interest* anywhere and everywhere within the limits of the United States. [256 F. at 259] [Emphasis added].

On appeal the Second Circuit affirmed, noting:

> [a] majority of the court think the foregoing federal legislation applies to goods in which the United States has a special property as bailee, as well as to such as it owns absolutely. Phelps v. People, 72 N.Y. 334. Therefore the first count of the indictment is good. [262 F. at 380 (2d Cir. 1919)].

■ *Walter* and the other cases cited make it clear that for the Property Clause to be properly invoked as a basis for congressional enactment, some actual and substantial property interest of the federal government must be involved.

■ There is no such interest here. The government has no property interest in the Planned Parenthood League, nor in any of the League's property. Its sole interest is in the partial funding of Planned Parenthood League programs, which does not rise to the special property interest of a bailment. To expand the applicability of the Property Clause into far-reaching areas so as to include the property of recipients of all federal

---

5. Whether the Planned Parenthood League is an instrumentality of the federal government is considered, *infra*, at 12.

funds controverts the original intent of the Property Clause and goes far beyond any previous judicial interpretation.

■■ The sole remaining basis for congressional authority to enact Section 844(f) is the Necessary and Proper Clause of the Constitution—Article 1, Section 8, Clause 18.[6] The scope of the legislative authority mandated by this Clause has never been clearly defined. At times the Supreme Court has indicated that the Necessary and Proper Clause is not an independent grant of power. Justice Clark went so far as to state:

> The latter clause [the Necessary and Proper Clause] is not itself a grant of power, but a *caveat* that the Congress possesses all the means necessary to carry out the specifically granted "foregoing" powers of § 8 "and all other Powers vested by this Constitution. . . . " As James Madison explained, the Necessary & Proper Clause is "but merely a declaration, for the removal of all uncertainty, that the means of carrying into execution those [powers] otherwise granted are included in this grant." VI Writings of James Madison, edited by Gaillard Hunt, 383 [Kinsella v. Single-

ton, 361 U.S. 234, 247, 80 S.Ct. 297, 304, 4 L.Ed.2d 268 (1959)].

■ The Court has held, however, that the Necessary and Proper Clause is a grant of authority to protect entities which are engaged in governmental functions:

> We assume here, as we assumed in Graves v. New York ex rel. O'Keefe, 306 U.S. 466, [59 S.Ct. 595, 83 L.Ed. 927] that the creation of the Home Owners' Loan Corporation was a constitutional exercise of the congressional power and that the activities of the Corporation through which the national government functions must be regarded as governmental functions and as entitled to whatever immunity attached to those functions when performed by the government itself through its departments. McCulloch v. Maryland, [17 U.S. 316] 4 Wheat. 316, 421, 422, [4 L.Ed. 579]; Smith v. Kansas City Title Co., 255 U.S. 180, 208, 209, [41 S.Ct. 243, 248, 65 L.Ed. 577]; Graves v. New York ex rel. O'Keefe, *supra.* Congress has not only the power to create a corporation to facilitate the performance of government functions, but has the power

---

6. The government has not argued that Section 844(f) can be sustained under any other provision of the Constitution than the Property Clause. While the preamble to Title XI of the Crime Control Act states that it is mandated under the Commerce Clause (Article 1, Section 8, Clause 3), the *House Report* states that Section 844(f) was not enacted pursuant to that clause. *See* 1970 U.S.Code Cong. & Admin.News at p. 4046 cited at p. 6, *supra.* Moreover, as to Section 844(f) there was no congressional finding as to how the proscribed activity burdens interstate commerce. Although Congress need make no formal findings as to how the regulated activity affects interstate commerce, in order for there to be a rational basis for congressional action the evidence at the hearings must indicate the nature and effect of the burdens on commerce which Congress meant to alleviate. Katzenbach v. McClung, 379 U.S. 294, 85 S.Ct. 377, 13 L. Ed.2d 290 (1964).

The Supreme Court has on occasion referred to non-enumerated essential or inherent powers of Congress embracing every other power essential to preserve the departments

and institutions of the general government from impairment or destruction. Burroughs and Cannon v. United States, 290 U.S. 534, 54 S.Ct. 287, 78 L.Ed. 484 (1934). These powers have been recognized only in situations, unlike the present, directly affecting national sovereignty: power in foreign affairs, United States v. Curtiss-Wright Export Corp., 299 U.S. 304, 57 S.Ct. 216, 81 L.Ed. 255 (1936); power to exclude aliens, Nishimura Ekiu v. United States, 142 U.S. 651, 12 S.Ct. 336, 35 L.Ed. 1146 (1892); power to protect federal elections, Ex parte Yarborough, 110 U.S. 651, 45 S.Ct. 152, 28 L.Ed. 274 (1884); and the power to fulfill obligations to other nations, United States v. Arjona, 120 U.S. 479, 7 S.Ct. 628, 30 L.Ed. 728 (1887). The only analogous situation is the inherent power of the federal government to protect federal employees. The Supreme Court only dealt with this power once, legitimizing its exercise in the *presidential* power of appointment and the President's general power to take care that the laws be faithfully executed. Cunningham v. Neagle, 135 U.S. 1, 10 S.Ct. 658, 34 L.Ed. 55 (1890).

to protect the operations thus validly authorized. "A power to create implies a power to preserve." McCulloch v. Maryland, *supra,* page 426 [4 L.Ed. 549]. This power to preserve necessarily comes within the range of the express power conferred upon Congress to make all laws which shall be necessary and proper for carrying into execution all powers vested by the Constitution in the Government of the United States. Const. Art. I, sec. 8, cl. 18, USCA. In the exercise of this power to protect the lawful activities of its agencies, Congress has the dominant authority which necessarily inhere in its action within the national field. [Pittman v. Home Owners' Corp., 308 U.S. 21, 32–33, 60 S.Ct. 15, 18, 84 L.Ed. 11 (1939)].

The Court in *Pittman* did not elaborate on the necessary nexus between the independent corporation and the federal government which made the protection appropriate. Chief Justice Hughes instead relied on the statutory assertion that the Home Owners Loan Corporation was a federal instrumentality thus partaking in the federal immunity from state taxation.

Important differences are readily apparent between the Home Owners' Loan Corporation and the Planned Parenthood League: (1) there is no congressional finding that Planned Parenthood is a federal instrumentality; and (2) unlike Planned Parenthood, the Home Owners' Loan Corporation was wholly owned by the federal government (308 U.S. at 26, 60 S.Ct. 15, argument for respondent).

▬ Nevertheless, Planned Parenthood League is an "instrumentality" of the federal government in that it provides facilities in furtherance of an announced national goal. HEW did more here than merely approve the League as a suitable clinic to be reimbursed for service rendered to clients. Planned Parenthood League is not the ultimate beneficiary of the program; rather, it is one of the agencies which the federal government uses in lieu of its own agency or facility to carry out a federal program. In effectuating that program with federal funds Planned Parenthood League acts as an instrumentality of the federal government to carry out the federal program.

Cases which focus on congressional power to protect instrumentalities do so in the context of legislation immunizing particular entities from state taxation.[7] Virtually all of the decisions in this area rely on Chief Justice Marshall's opinion in McCulloch v. Maryland, 17 U.S. (4 Wheat.) 316, 4 L.Ed. 579 (1819). The Court discussed at length the power of Congress to create the Bank of the United States and then voided a Maryland tax aimed at driving the Bank from Maryland. In two recent cases the Supreme Court has granted an entity other than the United States status as a tax-immune instrumentality. Standard Oil of California v. Johnson, 316 U.S. 481, 62 S.Ct. 1168, 86 L.Ed. 1611 (1942), involved an attempt by California to impose a tax on the privilege of distributing motor fuel on United States Army post exchanges. The Court concluded, after a detailed examination of the activities of the United States Army post exchanges, all of which were governmental in nature, that post exchanges as now operated "are arms of the government deemed by it essential for the performance of governmental functions. They are integral parts of the War Department, share in fulfilling the duties entrusted to it, and partake of whatever immunities it may have . . . ." 316 U.S. at 485, 62 S.Ct. at 1170. In Department of Employment v. United States, 385 U.S. 355, 87 S.Ct. 464, 17 L. Ed.2d 414 (1966), the Court held that the Red Cross is a federal instrumentality for purposes of tax immunity. It, thus, held invalid as applied to employees of the Red Cross a Colorado pay-

---

7. Although these cases are limited on their facts to protective legislation in the form of immunity from state taxation, the quoted language from *Pittman, supra,* at p. 11, is expansive and is applicable to protective legislation in the form of criminal sanctions.

roll tax designed to protect employment security. After reviewing the extensive and almost pervasive relationship with the United States, Justice Fortas found that the Red Cross functioned "virtually as an arm of the government." 385 U.S. at 359–360, 87 S.Ct. at 467.

Other institutions the Court has held to be federal instrumentalities include the Bank of the United States (McCulloch v. Maryland, *supra*); the Home Owners' Loan Corporation (Pittman v. Home Owners' Corp., *supra*) (an instrumentality by statute); the United States Spruce Corporation (Clallem County v. United States, 263 U.S. 341, 44 S.Ct. 121, 68 L.Ed. 328 (1923)) (wholly owned corporation of the federal government); the federal land banks (Smith v. Kansas City Title & Trust Co., 255 U.S. 180, 41 S.Ct. 243, 65 L.Ed. 577 (1920)); and national banks (Owensboro Natl. Bank v. City of Owensboro, 173 U.S. 664, 19 S.Ct. 537, 43 L.Ed. 850 (1898)).

In Smith v. Kansas City Title & Trust Co., *supra*, speaking of the federal land banks, the Court said:

[w]e therefore conclude that the creation of these banks, and the grant of authority to them to act for the government as depositories of public moneys and purchasers of government bonds, brings them within the creative power of Congress, although they may be intended, in connection with other privileges and duties, to facilitate the making of loans upon farm security at low rates of interest. [255 U.S. at 211, 41 S.Ct. at 249].

The Seventh Circuit in Weir v. United States, 92 F.2d 634, cert. denied, 302 U.S. 761, 58 S.Ct. 368, 82 L.Ed. 590 (1937), upheld a federal conviction for embezzlement from a state bank when that bank is insured by the Federal Deposit Insurance Corporation, stating that a state bank was an instrumentality of the government for purposes of federal protection:

. . . to the extent of this participation in the federal legislation [FDIC] each bank becomes an instrumentality of the federal government, enjoying its remedial legislation and bound by its legal limitations and responsibilities. [92 F.2d at 638).

The underlying rationale for this position is that the Federal Reserve System is entitled to federal protection and this necessarily encompasses state banks:

[b]ut every fraud like the one before us weakens the member bank and therefore weakens the System. Moreover, when it is necessary in order to prevent an evil to make the law embrace more than the precise thing to be prevented it may do so. [92 F.2d at 636].

Admittedly, the holding here is an extension and enlargement of previous rulings but one warranted by the reasoning of the existing cases. Congress must have the means to protect those institutions it is currently funding to carry out federal programs if those programs are to be economically or expeditiously carried out. It should not have to create a federal instrumentality in each instance but should be able to use existing instrumentalities. There could be no question but that Congress could protect these funds by making their embezzlement or the obtaining of them by fraud federal offenses. While actively using and funding such instrumentalities Congress should be able to protect them with criminal sanctions from. destruction or loss by direct, violent action, *i. e.*, the use of explosives. Section 844(f) is not unconstitutional.

For the foregoing reasons the Motion to Dismiss Count II is denied.